**Wanda KING, Individually and as Surviving Widow and Beneficiary of the Estate of Frank A. King, Deceased, and as Next Friend for Johnny King, and Rhonda K. Johnson, Appellant,**

v.

**Dr. Martin FISHER and Dr. Barry J. Alldredge, Appellees.**

No. 2–95–121–CV.

Court of Appeals of Texas, Fort Worth.

March 21, 1996.

Rehearing Overruled April 18, 1996.

From the 342nd District Court of Tarrant County, Bob McGrath, Judge.

Carr, Fouts, Hunt & Wolfe, L.L.P., Donald M. Hunt and Gary M. Bellar, Lubbock, for appellant.

Fielding, Barrett & Taylor, L.L.P., Tim G. Sralla and Dan R. Barrett of Fort Worth, for appellee Dr. Martin Fisher.

Cowles & Thompson, P.C., Julia F. Pendery and Charles T. Frazier, Jr. of Dallas, for appellee Dr. Barry J. Alldredge.

Before CAYCE, C.J., and LIVINGSTON and RICHARDS, JJ.

## OPINION

LIVINGSTON, Justice.

Appellant Wanda King sued Appellees Dr. Barry Alldredge and Dr. Martin Fisher for medical negligence after her husband, Frank King, committed suicide after being treated by the two doctors. At the conclusion of her evidence to the jury, the trial court directed a verdict in favor of the doctors and entered a take nothing judgment against Wanda. In two points of error, she appeals this decision

claiming that the directed verdict was improper because the evidence raised issues of material fact regarding her claims of medical negligence. Because we find that the directed verdict was proper as to the claims against Dr. Alldredge and Dr. Fisher, we affirm the judgment of the trial court.

## FACTS

Frank had a history of blood pressure problems, major depression, and cancer. On November 22, 1989, Frank went to the Harris Methodist Hospital HEB's ("Harris HEB") emergency room with seizures and a dangerously low sodium level. Dr. Alldredge, the internist on call, corrected Frank's life-threatening sodium level. Frank's family saw rapid improvement, and Frank appeared to be in good spirits. Dr. Alldredge discharged Frank around December 1.

After this discharge, Dr. Alldredge and Frank established an ongoing doctor-patient relationship. Frank went to Dr. Alldredge for follow-up visits. During these visits, Dr. Alldredge noted that Frank was having problems with depression and high blood pressure. Frank seemed to have some brain damage due to multiple ministrokes in his brain. In January 1990, Wanda took Frank to Dr. Alldredge because Frank had tried to commit suicide. Dr. Alldredge admitted Frank to Harris HEB to determine if Frank's depression, speech problems, and confusion were due to organic or medical causes. At this point, Dr. Alldredge referred Frank to Dr. Fisher for psychiatric care.

Dr. Fisher treated Frank, and Frank showed a marked improvement that led to his discharge from the hospital. Three days after Frank was discharged, he returned to Dr. Fisher for a follow-up visit. Dr. Fisher noted that Frank was "getting better with his psycho-social stressors" and stated that he wanted to see Frank again in six weeks. Dr. Alldredge was still treating Frank for his cancer problems.

Frank began to have delusions that if he did not drain all the water out of his swimming pool, the IRS would kill him. On March 15, 1990 at 9:30 a.m., a few days before Frank's scheduled follow-up visit with Dr. Fisher, Wanda called Dr. Alldredge and told him that Frank had taken an overdose of Valium four hours earlier. Dr. Alldredge told Wanda to immediately take Frank to Harris HEB's emergency room. Wanda did not take Frank to the emergency room. She called Dr. Alldredge later in the morning and told him that she was going to take him to see Dr. Fisher instead.

Dr. Fisher determined that Frank had not taken an overdose. Because of Frank's psychotic delusions, Dr. Fisher hospitalized him at Harris HEB's psychiatric unit. Dr. Fisher put Frank on suicide watch and prescribed an antipsychotic medicine for him. Frank's delusions were gone within two days. Frank was extremely concerned about his finances and paying Dr. Fisher's bill. On March 20, Dr. Fisher decided that Frank was almost ready for discharge. That same day, Dr. Fisher's office sent the Kings a letter stating that they needed to make a deposit for the hospital costs by March 23. Dr. Fisher scheduled Frank to be discharged on March 23, but this was postponed until March 26 because Wanda would be out of town until then. When Frank was discharged, Dr. Fisher told the Kings that they could either return to him for follow-up care, which would include continued billing, or they could go to Mental Health and Mental Retardation, a free counseling facility. Dr. Fisher noted that Frank's discharge was "a little premature," but he felt it was justified because Frank was no longer suicidal or psychotic. Based on the Kings' financial concerns, Dr. Fisher assumed that they would follow-up with MHMR and he considered his relationship with Frank ended when he was discharged. Dr. Fisher knew that Frank needed further medical care, but felt that Dr. Alldredge could take care of Frank's problems. If Dr. Alldredge could not meet Frank's psychiatric needs, Dr. Fisher believed that Frank could return to Dr. Fisher or try to get care through MHMR.

Wanda called MHMR the same day Frank was discharged, but they never called her back to get more information on Frank and to determine why he needed MHMR as they said they would. Wanda and Frank continued to try to contact MHMR after they

moved to Dallas in April 1990. Frank continued to see Dr. Alldredge to follow up on his medical care. On one such visit on June 14, 1990, Dr. Alldredge found that Frank had a prostate infection that was causing a urinary blockage that resulted in Frank's inability to urinate. Because draining Frank's bladder was risky as an office procedure, Dr. Alldredge felt Frank needed to go to a hospital. The Kings did not want to return to Harris HEB, which was suggested by Dr. Alldredge, because they did not want to add to their debt there. Dr. Alldredge then referred the Kings to Parkland Memorial Hospital because the Kings had recently moved to Dallas.

Wanda took Frank to Parkland, but they left because she got frustrated with the long wait. The Kings' son-in-law, an internist, arranged to have Frank admitted at Harris HEB. However, Wanda called Dr. Alldredge, who then personally scheduled Frank to see Dr. Wade Lowery, a urologist in Dr. Alldredge's building. Dr. Lowery drained Frank's bladder that day. He told them that surgery was needed, but it could not be performed then because Frank had an infection. Dr. Alldredge told Frank to come back in August or September for a check-up.

In August 1990, Frank began having seizures again and was taken to Presbyterian Hospital in Dallas. During his two-week stay, Frank expressed extreme fear about paying Presbyterian. The doctors treating him at Presbyterian[1] told him that his seizures and mental condition had worsened and there was no hope for his complete recovery. Two days after his release, Frank shot himself in the head. The suicide notes that he left for his children and his wife mentioned neither Dr. Alldredge nor Dr. Fisher.

At trial, Wanda offered the deposition testimony of Dr. John Simonds, a board-certified psychiatrist. He stated that he was familiar with the standard of care and that in his opinion Dr. Fisher breached that standard when he did not arrange any aftercare for Frank upon his March 1990 discharge. He further stated that Frank's condition worsened because of the lack of any psychiat-

ric care after he was discharged in March 1990 and it continued to decline until his suicide in August. However, Dr. Simonds felt that Dr. Fisher's decision to discharge Frank in March was "appropriate."

Wanda also offered the expert testimony of her son-in-law, Dr. Bill Johnson. Dr. Johnson testified that he was aware of the standard of care for internists and, in his opinion, Dr. Alldredge breached that standard of care when he did not promptly arrange for Frank's bladder drainage. Dr. Johnson also stated that because he himself did not have the proper equipment in his office, he would not be able to drain someone's bladder as an office procedure. He testified that Frank suffered unnecessary abdominal pain and had "significant psychological ramifications" as a result of Dr. Alldredge's breach of the standard of care. Further, Wanda had "significant emotional upset" from the day they tried to get Frank's bladder drained.

On appeal, Wanda admits that this evidence does not present an issue of material fact regarding a causal connection between the acts of Dr. Fisher or Dr. Alldredge and Frank's suicide. What she is claiming is that she, Frank, and their son and daughter sustained damages while Frank was alive because: (1) Dr. Fisher prematurely released Frank in March 1990 and abandoned Frank because he did not arrange for Frank's psychiatric care after his release; and (2) Dr. Alldredge failed to promptly drain Frank's bladder and abandoned them by summarily referring them to Parkland. She alleges that these acts were negligent and constituted abandonment.

We pause here to note that negligence and abandonment are not separate types of claims against a medical professional. Abandonment is merely another way of alleging a breach of duty. *See Lee v. Dewbre,* 362 S.W.2d 900, 902 (Tex.Civ.App.—Amarillo 1962, no writ) (holding that abandonment is one "type of wrong which may give rise to a claim for malpractice"). Therefore, we will treat Wanda's two separately pleaded causes of action against each doctor as two claims of medical negligence against each doctor.

---

1. Neither Dr. Alldredge nor Dr. Fisher treated Frank at Presbyterian.

## STANDARD OF REVIEW

In reviewing a directed verdict, we must view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Porterfield v. Brinegar,* 719 S.W.2d 558, 559 (Tex.1986); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983).

However, to avoid a directed verdict, Wanda had to offer evidence for each element of her negligence claims. The elements of a negligence claim are: (1) the existence of a duty on the part of one party to another; (2) a breach of the duty; (3) damages; and (4) causation. *Hager v. Romines,* 913 S.W.2d 733, 734 (Tex.App.—Fort Worth 1995, no writ). In a medical negligence case, a doctor-patient relationship must exist before there can be a breach of duty because the duty flows from the relationship. *St. John v. Pope,* 901 S.W.2d 420, 423 (Tex.1995). To prove breach of duty on her abandonment claim, she must have shown: (1) the unilateral severance of the doctor-patient relationship by the doctor; (2) without reasonable notice or without providing adequate alternative medical care; and (3) at a time when there is the necessity of continuing medical attention. *Lee,* 362 S.W.2d at 902. To prove abandonment, expert testimony is critical. *Cox v. Jones,* 470 N.W.2d 23, 26–27 (Iowa 1991).

If there is any conflicting evidence of probative value that raises a material fact issue, *White,* 651 S.W.2d at 262, a determination of that issue is for the jury. *Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). However, whether a duty existed on the part of the doctor is a question of law. *St. John,* 901 S.W.2d at 423.

Regarding Dr. Alldredge, the trial court correctly granted a directed verdict on Wanda's negligence claims. Wanda failed to raise a material fact issue regarding a breach of the standard of care. Her own expert testified that a bladder drainage could not be safely performed in an internist's office. Wanda's abandonment allegation likewise fails because she did not offer any evidence that shows that Dr. Alldredge ever unilaterally severed the doctor-patient relationship. In fact, the evidence shows that Wanda called Dr. Alldredge after the alleged "severance" and he arranged for Frank to see Dr. Lowery. Because the evidence was insufficient to raise a fact issue on a breach of duty by Dr. Alldredge, he was entitled to judgment as a matter of law. *See Boswell v. Farm & Home Sav. Ass'n,* 894 S.W.2d 761, 768 (Tex.App.—Fort Worth 1994, writ denied).

We also believe that the trial court correctly directed a verdict in Dr. Fisher's favor on Wanda's claims of negligence for failing to arrange for Frank's aftercare. Wanda and Frank chose to pursue their options with MHMR instead of continuing with Dr. Fisher. They obviously considered their relationship with Dr. Fisher to be ended when they called MHMR to try and arrange for free care for Frank after the March 1990 discharge. Dr. Fisher could not have breached his duty to Frank when both Frank and Dr. Fisher considered the doctor-patient relationship to be terminated. *See Wheeler v. Yettie Kersting Memorial Hosp.,* 866 S.W.2d 32, 38 (Tex.App.—Houston [1st Dist.] 1993, no writ) (a relationship must exist before any legal duty to the patient arises on the part of the doctor). Further, Dr. Fisher did not abandon Frank because there is no evidence that he failed to recommend a reasonable aftercare alternative to Frank or that Dr. Fisher unilaterally severed his relationship with Frank.

Additionally, Wanda did not raise a fact issue on her allegation that Dr. Fisher was negligent for releasing Frank early: Wanda's own expert, Dr. Simonds, testified that Frank's release was "appropriate." Wanda presented no evidence establishing that Dr. Fisher released Frank prematurely. Wanda therefore failed to establish a breach of duty by Dr. Fisher on her allegation that Dr. Fisher released Frank prematurely.

Thus, we overrule Wanda's points of error and affirm the directed verdict in favor of Dr. Alldredge and Dr. Fisher.