Rodney P. **TIEKEN**, Appellant,

v.

**MIDWESTERN STATE UNIVERSITY**
**and Midwestern State University**
**Foundation, Inc., Appellees.**

Rodney P. **TIEKEN**, Appellant,

v.

Ruth I. **BEYER**, Appellee.

Nos. 2–94–062–CV, 2–94–240–CV.

Court of Appeals of Texas,
Fort Worth.

Dec. 21, 1995.

---

C. Dan Campbell, Brooks & Campbell, Wichita Falls, for Appellant Rodney P. Tieken.

Roger Lee, Gibson & Hotchkiss, Wichita Falls, for Appellees MSU & MSU Found., Inc.

Steve Briley, Banner & Briley, Wichita Falls, for Appellee Ruth I. Beyer.

Before CAYCE, C.J., and LIVINGSTON and BRIGHAM, JJ.

## OPINION

BRIGHAM, Justice.

Rodney P. Tieken appeals adverse judgments in two lawsuits stemming from a will contest. Tieken claims that in the will contest suit (cause number 2–94–240–CV), the trial court erred in overruling his Motions for Judgment Notwithstanding the Verdict and for New Trial because the evidence was legally and factually insufficient to support the jury's findings of lack of testamentary capacity and undue influence. Tieken also claims that the trial court erred in granting summary judgment for Midwestern State University and the Midwestern State University Foundation in a separate, but related, lawsuit (cause number 2–94–062–CV) concerning an informal contingent fee agreement between Ruth Beyer and MSU.[1] The cases were

---

1. MSU refers to both Midwestern State University and the Midwestern State University Foundation, Inc.

consolidated on appeal. We affirm the former and dismiss the latter.

## BACKGROUND

Tieken met John and Pauline Abbott in May 1977, when he adjusted an insurance claim for hail damage on their Wichita Falls house. Tieken and the Abbotts became friendly; Tieken worked in the yard with Pauline and had dinner with the couple periodically. When Tieken became engaged to be married, the Abbotts offered to sell him a duplex house that they owned. In 1978, John showed Tieken the Abbotts' financial books and had Tieken's name put on the signature card for the Abbotts' safe deposit box. Although Tieken and his wife moved to Abilene in 1979, his friendship with the Abbotts continued. In 1981, he and his family returned to Wichita Falls.

The Abbotts executed wills in 1981 that left their estates to the surviving spouse and then to the Midwestern State University Foundation to establish scholarships for premedical and nursing students. Their wills were drafted by attorney Bill Browning and a later codicil named the Abbotts' friend Beyer independent executrix. In 1985, the Abbotts appointed Beyer their attorney-in-fact by a power of attorney.

John died in May 1986. Browning handled the legal work to have John's will admitted to probate, and Beyer served as executrix. According to Beyer, John expressed concern about Tieken's trustworthiness before John's death.

Pauline's health began declining in the early 1980s, when she suffered a stroke. She had fainting spells and frequently fell. During these attacks, Pauline suffered numbness in her hands, blurred vision, and memory loss. On one occasion, Beyer took Pauline to the emergency room for treatment after a fall. Beyer continued to care for Pauline once she returned to the Abbott home after this episode.

Early one morning in 1987, Pauline thought she had suffered another stroke and contacted Tieken and Beverly Power, whom she had met through a service club several years earlier. Pauline wanted Power to find out about moving to Rolling Meadows Nursing Center. At this point, Tieken decided to "take charge" of Pauline and moved her into the nursing home.

On April 8, 1987, Beyer and her husband drafted an "open" letter regarding Pauline's move to Rolling Meadows, asserting that "motives are obviously in question," and noting that John and Pauline had declined Tieken's previous request to borrow $30,000.00. Tieken and Power both claimed that Pauline was mad about the Beyers' letter because of the perception that it questioned Tieken's integrity. On April 15, 1987, Pauline wrote Beyer that she was revoking Beyer's power of attorney and naming Tieken as her attorney-in-fact instead.

On August 14, 1987, Pauline executed a new will, that left a substantial portion of her estate to Tieken. Power testified that she had been "instrumental in Pauline getting her new will set up" and had typed lists concerning Pauline's property so that she could "organize her mind." Tieken reviewed the lists and made notes. Power selected Bob Goff, the attorney Pauline used to prepare the new will. Upon Pauline's death, Goff filed an application to probate the 1987 will, and Beyer filed a contest to that application. A trial was held to determine the validity of the 1987 will. The jury determined that the 1987 will was the product of undue influence and that Pauline lacked testamentary capacity. Tieken appeals this judgment.

## THE WILL CONTEST

In his first point of error, Tieken contends the trial court erred in overruling his Motion for JNOV and his Motion for New Trial because the evidence is legally and factually insufficient to support the jury's finding that Pauline lacked testamentary capacity when she executed the August 1987 will. He contends that although Pauline had suffered some strokes, those people who knew her best all testified that the strokes did not affect her mentally. Even Beyer, he claims, testified that the strokes only briefly affected Pauline's memory. Tieken points to testimony from Power and Joyce Buchanan regarding Pauline's bookkeeping and from Dr. Ste-

phen Farmer's medical records, dated three weeks before the August 1987, will showing that Pauline was alert, her speech was fluent, her cognitive functions appeared intact, and Pauline's memory was consistent with her age.

Tieken challenges treating physician Dr. J.B. Hathorn's assertion that Pauline's hallucinations three days after she signed the August 1987 will had a probability of affecting Pauline on the day the will was signed, particularly considering that ten months later, Dr. Hathorn said he did not see any real change in Pauline's memory. Tieken asserts that the only witness who testified that Pauline lacked capacity on August 14, 1987, was Dr. Robert McBroom, Jr., another treating physician, who, Tieken claims, was impeached repeatedly.

■ Testamentary capacity means that a party must have sufficient mental ability to: (1) understand the business in which the party is engaged; (2) understand the effect of the act in making a will; (3) understand the general nature and extent of the party's property; (4) know the party's next of kin and natural objects of the party's bounty and the claims upon them; and (5) collect in the party's mind the elements of the business to be transacted and hold them long enough to perceive their obvious relation to each other and to form a reasonable judgment about them. *Prather v. McClelland,* 76 Tex. 574, 13 S.W. 543, 546 (1890). Tieken contends he was able to establish Pauline possessed all of the above.

Tieken says Pauline knew that she was engaged in the act of making a will. He points to his testimony and that of Buchanan, Power, and Marie Cargal, who all said that Pauline had planned to make a new will over the course of several weeks. Goff said that he spent at least five hours with Pauline during three separate meetings and had no reason to believe she was not fully competent. Goff told the jury that Pauline had told him to increase the bequest to Tieken's children's trust and had told him to include an *in terrorem* clause.

Tieken asserts Pauline knew the effect of her act in making a will. Goff and Shirley Keltner, a witness to the signing, said that Pauline and Goff reviewed each paragraph. Goff said that Pauline, that day, told him a story about each of the people who would benefit from the will.

For his position that Pauline knew the nature and extent of her property, Tieken relies on Power's testimony that she typed the list of Pauline's assets based on what Pauline told her. Goff said there was never a time during the five hours he spent with Pauline on the day of the signing that she appeared not to know what she owned.

Tieken says Pauline knew her next of kin and the natural objects of her bounty. Specifically, Goff testified that Pauline wanted to leave her assets to her friends because they had been there when she needed them. Several witnesses, including Buchanan, Power, Cargal, James Crowley, and Goff, testified that Pauline was fond of Tieken and his children; Toni DeSteffano established Pauline's concern for the Humane Society and the Faith City Mission, two charities omitted from the 1981 will but included in the 1987 will.

Finally, Tieken claims Pauline had sufficient memory to recollect the elements of the business she was transacting, based on the testimony from Goff and Keltner. Keltner said she saw no sign of any memory lapse during the signing conference, and Goff said Pauline had no problems recalling conversations they had during previous meetings. Tieken claims that even Beyer and Ann Voyles must have been convinced that Pauline was of sound mind as of late June 1988, ten months after the signing, because Voyles, who had been Pauline's bookkeeper, prepared a new power of attorney, naming Beyer, for Pauline to sign.

Beyer responds that Tieken, as proponent of the 1987 will, had the burden to establish Pauline had testamentary capacity when she signed the will and that because the jury failed to find that Pauline was of sound mind, Tieken must show that he established testamentary capacity as a matter of law to be entitled to a JNOV. She relies on *Croucher v. Croucher,* 660 S.W.2d 55, 57 (Tex.1983) for that proposition.

Beyer further notes that even if it is legally possible [2] to establish testamentary capacity as a matter of law, it only takes "some" evidence to the contrary to create a fact issue. *See Id.* at 57–58. She asserts that the present record contains ample evidence indicating Pauline's lack of testamentary capacity. Beyer points to evidence that Pauline had hardening of the arteries in her brain and heart, which diminished the flow of oxygen to her brain. This condition caused Pauline to have strokes and transient ischemic attacks and was treated with Ativan, a drug which has the side effect of producing hallucinations. Pauline had been on this drug for a year before the August 1987 will signing, and Power testified that Pauline had hallucinations both before and after the signing. Dr. McBroom said that in his opinion, Pauline lacked testamentary capacity. Beyer concludes that based on this evidence, the jury could reasonably infer that Pauline lacked capacity on August 14, 1987, and that Tieken's request for reversal based on legal insufficiency should be denied.

Beyer also rebuts Tieken's assertion that the evidence is factually insufficient. She first highlights Dr. McBroom's testimony, pointing out that he treated Pauline from 1984 until April 3, 1987. Dr. McBroom testified that Pauline had a history of strokes and "cerebral vascular accidents," had suffered two strokes before coming to him, and had suffered two more while under his care. Dr. McBroom said that the conditions caused by the destruction of Pauline's brain cells, as a result of diminished blood supply to the brain, could not improve. Dr. McBroom recalled that on September 19, 1986, Pauline arrived at his office without an appointment, not knowing why she was there or what she wanted. He attributed Pauline's hallucinations on August 17, 1987 to use of the prescription drug Ativan and said that in his opinion, Pauline lacked capacity on August 14, 1987.

Beyer contests Tieken's claim that Dr. McBroom was repeatedly impeached. She says most of the so-called "impeachments" were instances during a telephone conference or deposition when Dr. McBroom did not have access to Pauline's records and could not answer specific questions. Beyer avers that it is the responsibility of the jury, not Tieken, to judge the credibility of witnesses and resolve conflicts in their testimony.

Beyer also relies on Dr. Hathorn's testimony that Pauline's mental ability was "suspect" on August 14, 1987. She notes that although Dr. Hathorn signed a note stating that Pauline was capable of making a new will, he changed his mind after learning that she had experienced hallucinations three days after the signing. Dr. Hathorn recalled that on June 25, 1987, two months before signing the new will, Pauline couldn't remember telling the physician about her symptoms on a prior occasion. Two months after the will signing, Pauline was prescribed with a medication to treat Alzheimer's disease.

Power testified that Pauline had experienced hallucinations and that was "probably" why she included the question "[D]o I need a statement from my doctor as to my mental state?" in the material Power prepared for Pauline to give to the lawyer. Power also admitted that Pauline suffered from poor memory in August 1987.

Beyer says there is also evidence Pauline did not know the size of her estate. Goff testified that the estate was worth at least $410,000. But, in the flow chart prepared showing the disposition of the estate under the new will, neither the gross value of the estate nor the amount Tieken would take were listed.

Cargal said Pauline never overcame her depression after John's death and that Pauline was not capable of taking care of herself even before she moved to the nursing home. Voyles testified that Pauline was forgetful and could not remember giving instructions after John's death. Finally, Beyer relies on her own testimony as well. She stated that

---

2. Ruth points out that some authorities hold that because all testimony concerning mental capacity, both lay and expert, is nothing more than opinion, the material fact of testamentary capacity cannot be established as a matter of law.

*Williford v. Masten,* 521 S.W.2d 878, 884 (Tex. Civ.App.–Amarillo 1975, writ ref'd n.r.e.); *James v. Gant,* 469 S.W.2d 927, 928 (Tex.Civ.App.– Waco 1971, no writ).

she had to pay the household bills for Pauline after John's death because Pauline lacked the attention span to complete the task. Beyer said Pauline became depressed and frail as her disabilities accumulated.

If an appellant is attacking the legal sufficiency of an adverse answer to a finding on which he had the burden of proof, the Texas Supreme Court has stated that the appellant must, as a matter of law, overcome two hurdles. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991).

■ Although Tieken incorrectly phrased his point of error and argued there was "no evidence" to support the jury's answer, he has still invoked this court's appellate jurisdiction to consider the contention that the opposite of the answer was established as a matter of law. When the party having the burden of proof on a fact issue appeals from an adverse fact finding, the point of error challenging the legal sufficiency of the evidence should be that the fact was established "as a matter of law." *Croucher,* 660 S.W.2d at 58. We first review whether there was some evidence to support the jury's answer; if there is none, we will determine if the converse was established as a matter of law.

■ The jury had before it testimony that Pauline lacked the attention span to pay her monthly bills, could not remember having discussed her medical condition with doctors, showed up at the doctor's office disoriented, and was taking medication causing hallucinations in the year before signing the new will. There was some evidence to support the jury's finding. Tieken therefore did not prove as a matter of law that Pauline had testamentary capacity, and the trial court did not err in overruling Tieken's Motion for JNOV.

■ Tieken's complaint that his Motion for New Trial should have been granted raises a factual sufficiency issue. In reviewing a point of error asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as the evidence that tends to

disprove its existence. *Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ Findings of fact are the exclusive province of the jury. *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 744–45 (Tex.1986). A court of appeals cannot make findings of fact; it can only "unfind" facts. *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986). Both Tieken and Beyer point to ample testimony supporting their positions, and the jury had before it a herculean task sifting through the testimony from physicians and from those who considered themselves friends of Pauline. Although there is no direct evidence Pauline lacked testamentary capacity on the day she executed the will, evidence of incompetency at other times can be used to establish incompetency on the day the will was executed if it demonstrates that the condition persists and has some probability of being the same condition that existed at the time of the will's making. *Lee v. Lee,* 424 S.W.2d 609, 611 (Tex.1968). This was true in Pauline's situation, where Power acknowledged hallucinations three days after the will's execution and where the medical testimony indicated the hallucinations were caused by a drug Pauline had taken for approximately one year.

■ This court is not a fact finder, and we do not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if there is conflicting evidence that would support a different conclusion. *Cain,* 709 S.W.2d at 176. As a result, we conclude that the jury's determination that Pauline lacked testamentary capacity on August 14, 1987 was not against the great weight and preponderance of the evidence and the trial court did not err in

overruling Tieken's Motion for New Trial. Point of error one is overruled.

Next, Tieken complains that the trial court erred in overruling his Motion for JNOV and his Motion for New Trial because the evidence is legally and factually insufficient to support the jury's finding that Pauline was unduly influenced by Tieken or Power to execute the August 14, 1987 will.

Tieken says that the evidence consistently shows Pauline considered Tieken to be like a son to her and treated his daughters like her own grandchildren. He contends that nothing could have been more natural than for Pauline to want her last will to benefit the friends she considered family and the various charities she had supported over the years. He asserts that neither Beyer nor her husband Art offered any evidence in support of the allegation of undue influence. He claims that Pauline was not someone who was susceptible to undue influence and that four witnesses testified regarding Pauline's strong personality. He concludes by relying on the testimony from Crowley, an investigator with the Department of Human Services. Crowley had been contacted by Voyles, who was worried Pauline was being exploited. Crowley said that Pauline was well aware of the changes she had made to her will and power of attorney and provided reasons for having done so.

Beyer responds that Pauline was depressed and lonely following the death of her husband and was dependent upon others for care and companionship. Beyer notes that before April 1, 1987, Tieken had never managed Pauline's personal or financial affairs. Tieken, Beyer asserts, tried unsuccessfully to borrow $30,000 from John and Pauline and knew that their estate was worth approximately $300,000.

Beyer claims that Tieken had obtained a power of attorney over Pauline's affairs within two weeks of moving her to a nursing home. Beyer asserts that within four months, Tieken and Power had changed Pauline's residence, her attorney-in-fact, her doctor, her lawyer, and her accountant.

Beyer also notes that Power admitted she was instrumental in getting the August 1987 will set up. Power selected the attorney and prepared a type-written list of assets and questions for the attorney. Tieken made notes and corrections on the typed lists and was present at the nursing home when the will was signed. Beyer also relies on testimony that either Power or Tieken was always with Pauline and testimony from Voyles that she was prevented from seeing Pauline by Power or by an aide hired by Tieken.

In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992); *In re King's Estate*, 244 S.W.2d at 661–62. If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993).

A "no evidence" point of error may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco*, 824 S.W.2d at 556.

To prove undue influence, the party raising the issue must establish:

(1) The existence and exertion of an influence;

(2) The effective operation of such influence so as to subvert or overpower the

mind of the testator at the time of the execution of the will; and

(3) The execution of a will that the maker would not have executed but for the influence.

*Rothermel v. Duncan,* 369 S.W.2d 917, 922 (Tex.1963). Proof of undue influence may be made by circumstantial evidence, and even if none of the circumstances alone is sufficient to show the elements of undue influence, they may be sufficient when considered together. *Id.*

■ Voyles testified that she was unable to visit Pauline in the nursing home because she was repeatedly turned away by either Tieken or Power. Tieken had little, if any, involvement in Pauline and John's financial affairs during their marriage and in the months immediately after John's death but before Pauline's move to the nursing home. It was Tieken who decided when Pauline would move to the nursing home and managed to arrange the move, according to Power, in four days. While Pauline was living in the home she had shared with John, she had a circle of friends visiting and assisting her; once she moved to the nursing home, her circle of friends diminished considerably. There was evidence that change was caused, at least in part, by Tieken and Power. Additionally, Power acknowledged making the arrangements for Pauline's August 1987 will, including finding her an attorney, preparing the checklists, and arranging for a note regarding her testamentary capacity. We reject Tieken's assertion that there was "no evidence" to support the jury's finding and hold the trial court did not err in denying Tieken's Motion for JNOV.

■ An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination and, if reversing, to detail that evidence in the opinion. *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993).

Pauline was surrounded by people who wished to assist her in the management of her affairs, and it is impossible to know their motives in doing so. Pauline was a depressed and fragile woman who missed the companionship of her husband and regretted that the series of strokes left her unable to participate in the activities she loved. She became increasingly dependent on a dwindling group of people for advice and assistance. Although there was testimony that Pauline was strong-willed, even impatient at times, and Crowley's testimony that Pauline was aware of changes made to the will, there was also evidence to the contrary. In fact, some of the testimony was contradictory. For example, Power asserted that she prepared the list of beneficiaries to assist Pauline, but then also testified that Pauline was capable of calling the Humane Society and the Faith City Mission to learn how to bequeath them money. The evidence supporting the jury's finding that Pauline was unduly influenced by either Tieken or Power was not so weak, nor the evidence to the contrary so overwhelming, to require reversal. Point of error two is overruled.

## THE SUMMARY JUDGMENT LAWSUIT

Tieken asks us to decide what is a question of first impression, namely whether a party's willingness to contribute to the legal expenses of a contestant to a will necessarily makes the contributor a "party contestant."

MSU was the primary beneficiary under the 1981 will that Pauline executed contemporaneously with John's will. Under the 1987 will, MSU still receives a bequest but a far smaller one than under the previous will. MSU reached a fee agreement with Steve Briley, Beyer's attorney, contingent upon a successful contest of the 1987 will. The agreement was that if the 1987 will was successfully contested, and if the 1981 will was successfully probated, MSU would pay Briley one-third of the amount it received in excess of what it would have taken under the 1987 will. Tieken alleged that MSU, by entering into the agreement with Briley, is contesting the 1987 will. MSU replied that even if the oral, informal agreement for MSU to help pay Beyer's legal expenses is binding,

such a commitment does not make MSU a party to the will contest. Because we find this issue has been rendered moot by our decision in the will contest, we dismiss Tieken's appeal of the summary judgment.

The mootness doctrine limits courts to deciding cases in which an actual controversy exists. *Federal Deposit Ins. Corp. v. Nueces County,* 886 S.W.2d 766, 767 (Tex.1994). Where there has ceased to be a controversy between the litigating parties due to events occurring after judgment has been rendered by the trial court, the decision of an appellate court would be a mere academic exercise and the court may not decide the appeal. *Brown v. KPMG Peat Marwick,* 856 S.W.2d 742, 751 (Tex.App.–El Paso 1993, writ denied).

The 1987 will had an anti-contest clause. MSU could have lost its bequest had the 1987 will been found valid and had MSU violated that clause by being classified as a party-contestant. The anti-contest clause has been rendered irrelevant with the determination that the 1987 will was the product of undue influence; it does not matter whether MSU is a party-contestant to the 1987 will under these circumstances. Our affirmation of the trial court's judgment in the will contest has rendered the Tieken–MSU litigation immaterial. The appeal is dismissed as moot.

The judgment of the trial court in the will contest is affirmed. We dismiss the Tieken–MSU case as moot.