**Melba Jean HORTON, Appellant,**

v.

**Mitchel Montgomery (Babe) HORTON, Henderson Fillmore Horton, and Eric Wayne Horton, Appellees.**

No. 2–97–023–CV.

Court of Appeals of Texas,
Fort Worth.

March 12, 1998.

Rehearing Overruled April 23, 1998.

Leslie Combs, Michener, Larimore, Swindle, Whitaker, Flowers, Sawyer, Reynolds & Chalk, L.L.P., Fort Worth, David Spiller, Spiller & Spiller, Fort Worth, for Appellant.

Bradley C. Miles, San Angelo, for Appellee.

Before CAYCE, C.J., and DAY and HOLMAN, JJ.

## OPINION

DAY, Justice.

This is a will contest case filed by Appellees Henderson Fillmore Horton, Mitchel Montgomery "Babe" Horton, and Eric Wayne Horton, the sons and grandson of the deceased, Henderson "Pete" Horton. Appellant Melba Jean Horton, the deceased's wife, challenges the trial court's order setting aside Pete's will and revoking the letters testamentary issued to Melba on February 7,

1994. Appellees bring three cross-points, alleging that the trial court erred in granting a judgment n.o.v. on the issue of testamentary capacity, in denying Appellees' motion for summary judgment, and in granting Melba's motion for a partial summary judgment. Because we find that (1) there was no evidence to support the jury's finding that Pete lacked testamentary capacity, (2) there was no evidence to support the jury's finding that Melba procured the will through undue influence, (3) the denial of Appellees' motion for summary judgment may not be appealed following a trial on the merits and entry of a final judgment, and (4) Appellees waived their third cross-point by failing to adequately brief that complaint, we affirm in part and reverse and render in part.

## BACKGROUND

Pete and Melba married on December 22, 1975. During the marriage, Pete executed four wills. In 1977, Pete wrote a holographic will leaving his entire estate in fee simple to Melba. Four years later, he drew another holographic will, this time leaving his personal property to Melba outright and his real property to her for life, remainder to be divided equally between Pete's two sons from a previous marriage, Fillmore and Babe, and Melba's son and daughter from a previous marriage, Debra Jean Voyles King and James Michael Voyles. In 1991, Pete and Melba executed a joint and contractual will that left all personal property to the surviving spouse in fee simple and all real property to the survivor for life, remainder to Pete's two sons and Melba's son and daughter. On December 30, 1993, Pete and Melba executed a second joint and contractual will, under which all property would pass to the survivor in fee simple. In the event the survivor decided to sell the real property, a provision in the 1993 will granted a first option to purchase to Pete's sons and Melba's daughter and son.

Pete died on January 20, 1994, survived by Melba, Fillmore, and Babe. Pete is also survived by Appellee Eric Horton, the only child of Pete's son Samuel who died in 1977. On January 26, 1994, Melba filed an application to probate the 1993 will. The trial court admitted the will to probate and Melba qualified as independent executor on February 7, 1994.

On September 30, 1994, Appellees filed a motion for summary judgment to set aside the order admitting the will to probate, asserting that the will's self-proving affidavit was fatally defective because the witnesses, Teresa Weaver and Lana Osteen, failed to "swear" to the truth of the affidavit as required by section 59 of the Texas Probate Code. TEX. PROB.CODE ANN. § 59 (Vernon Supp.1998). The trial court denied Appellees' motion for summary judgment on October 7, 1994.

On June 26, 1995, Appellees filed an amended petition alleging that Pete lacked testamentary capacity to execute the will and that Melba procured the will through undue influence. Appellees also petitioned the trial court to impose a constructive trust on a 180–acre tract of land, one-half of which Pete had conveyed to Melba by deed on April 20, 1989, and the remaining one-half of which Pete devised to Melba under the 1993 will. On June 30, 1995, Melba filed a motion for partial summary judgment, alleging that the statute of limitations and the parol evidence rule barred Appellees' suit for a constructive trust. The trial court issued an order granting the motion for partial summary judgment on December 5, 1995.

The remaining issues were tried to a jury on June 18, 1996, at which time Appellees presented the following testimony:

James Spiller, the attorney who drafted the 1991 and 1993 wills, testified that he initiated the conversation about changing the life estate provision in the 1991 will with Melba and suggested that she and Pete discuss the effect of that provision. Spiller said that he was concerned Melba might have problems paying off the note on the real property after Pete died and would be unable to sell the property because of the remainder interest.

Spiller also testified about the execution of the 1993 will. He said that the Hortons executed the will at their home and that Pete read it before he signed it, and then Spiller read it aloud to Pete, Melba, and the two

witnesses present. Spiller said that prior to December 30, 1993, he and Pete had not discussed the will. He also testified that Pete appeared to be extremely ill on that day and was less active than in the past, but very alert. According to Spiller, Pete expressed no reservations about executing the will. Moreover, Spiller testified that Pete understood the 1993 will and that Pete was knowledgeable about the effect of certain will provisions because he and Spiller had discussed them regarding Pete's previous will.

In addition, Spiller testified that Pete was still conducting his own business affairs in December 1993. Spiller also said that he believed Pete was very strong-willed and Melba could not have coerced him to sign the will if he had not wanted to. Last, he testified that Pete had specifically said that he did not want to leave anything in his will to his grandson Eric.

Melba testified that Pete had thyroid cancer and that a C.A.T. scan during the first week of January 1994 revealed that the cancer had spread to his brain, skull, and bones. She said that in mid-December 1993, Pete began taking morphine and MS–Contin for pain relief and Zoloft, an anti-depressant. Melba stated that although she believed that the medications must have affected Pete's mental capacity to some degree, she could not tell that they did. She testified that Pete continued to handle all the family business despite his illness, and he was still serving as Jack County constable in December 1993. She said that following a chemotherapy treatment in January 1994, Pete was confused at times, but usually acted alert and continued to handle his business affairs. Although Melba said that Pete hallucinated at times, she testified that such episodes occurred infrequently and only caused Pete to imagine things on the bedspread that were not actually there. She could not recall any specific times when those episodes occurred, except that Pete had been hallucinating before he was admitted to the hospital on January 19, 1994.

Melba further testified that Spiller brought up the potential problem with the life estate provision in the 1991 will and asked her to discuss it with Pete. She said that after talking about it with Pete, she called Spiller and asked him to prepare the will without the life estate. ·

Regarding the execution of the will, Melba testified that Spiller gave Pete a copy of the will and Pete read it, then Spiller read the will aloud to everyone present. She said that Pete had not taken any medication prior to executing the will that would have prevented him from understanding the contents of the will, or from objecting if he did not want to sign it. Melba also testified that Pete was set in his ways and would not have signed the will if he had not wanted to. She said that Pete was headstrong and not easily influenced by others, and that his illness did not change those character traits.

Babe, Pete's youngest son, testified that when he visited his father during the last two months of Pete's life, sometimes Pete would "just go to mumbling" and "wouldn't make no sense [sic]." However, Babe testified that he never saw his father do anything else that he considered irrational. Babe said that Melba brought pills to Pete and Pete kept liquid medication beside the bed which he occasionally drank. Nevertheless, Babe said that he could not discern any difference in his father's behavior after he took the medicine, and he did not know whether his father was taking the medicine on December 30, 1993.

Babe testified that he saw his father practically every day during the last two months of his life, but he did not remember seeing him on December 30, 1993. He also testified that the last time he remembered seeing Pete before the day the will was executed was December 24, 1993.

Fillmore, Pete's middle son, testified that after his father returned from chemotherapy treatments in Houston in early January 1994, he did not seem to be himself. Fillmore said that the last few times he saw his father, Pete's mental capacity appeared to be affected by the pain he was in and the medication he was taking. Although Fillmore testified that he believed Melba could influence Pete, he acknowledged that Pete was stubborn, strong-willed, and not easily dominated by other people, and said that he had never seen

Melba make Pete do anything he did not want to do. Last, Fillmore testified that he did not see his father on December 30, 1993.

Teresa Allen, a nurse at the Jacksboro Nursing Center, testified that she saw Pete on January 10, 1994, after he returned from the chemotherapy treatment in Houston. According to Allen, Pete acted confused and disoriented. She also testified that she saw Pete at his home on Christmas Eve 1993 and he was very sick. She did not recall seeing him on December 30, 1993, and did not know what his condition was on that day.

Lee Ann Horton, Babe's wife, testified that Pete was extremely weak and in a great deal of pain on December 24, 1993. She also testified that her father-in-law was strong-willed, bull-headed, and not easily swayed. Last, she testified that she did not see Pete on December 30, 1993.

Appellees called three additional witnesses: Pete's grandson Eric, who testified that he had not communicated with his grandfather in more than 10 years; John Rudder, a registered pharmacist, who testified regarding the types of medications prescribed to Pete; and Dr. James Womack, who testified regarding Pete's medical condition based on a review of his medical records. Both Rudder and Womack testified that they never physically examined Pete or discussed Pete's condition with anyone who had examined him.

After Appellees rested, Melba's counsel moved for a directed verdict, which the trial judge denied. Melba proceeded with her case and called the following witnesses:

Linda Loncar, a retired schoolteacher, testified that she visited Pete at his home on December 30, 1993. She said that Pete was bright and alert, and not groggy or sleepy. She also testified that in her opinion, Pete had not taken any medication that day. Loncar said that she had known Pete for many years and she believed that he was not easily dominated by other people.

Armanda Plaster, Pete's older sister, testified that she had known Pete all his life and Pete always "did what he wanted to do the way he wanted it done." She also said that in her opinion, no one told Pete what to do and his illness did not change that fact.

Plaster testified that despite the cancer, Pete continued to handle all of his own business dealings until the day he died.

Frank Gilliam testified that he had known Pete for eighteen years and Pete could not have been manipulated to do something he didn't want to do. He testified that Pete was strong-willed and continued to handle his own business affairs even after he became ill. Gilliam also testified that he saw Pete during the first week of January 1994 and Pete did not appear to be medicated. He said that he and Pete discussed business during the visit and Pete calculated the money due on a line of credit he carried for Gilliam.

James Hammond testified that he had known Pete for twenty-five years and Pete was not easily swayed by others. He also testified that he did not believe Melba could have coerced Pete to do something he did not want to do.

Dr. Sushil Chokshi testified that he was Pete's physician and he had known Pete for several years. He said that when he examined Pete in his office on December 17, 1993, Pete appeared to be in full control of his mental capacity. Chokshi also stated that he did not believe the medications prescribed to Pete had impaired his ability to know his surroundings or his family. Last, Chokshi testified that when Pete was admitted to the hospital on January 19, 1994, the day before he died, family members told Chokshi that Pete was hallucinating at times.

Boyce Hart testified that he had known Pete all his life and Pete was not easily swayed or dominated by others. Hart also stated that during the months of December 1993 and January 1994, he noticed no change in Pete's demeanor.

Teresa Weaver, one of the witnesses to the 1993 will, testified that she had known Pete since 1977 and she did not believe that Melba could have made him sign the will if he had not wanted to. She also testified that Spiller read the will to Pete and Pete asked some questions about the will before signing it, which Spiller answered. Regarding the execution of the will, Weaver said she believed that Pete knew who his family was, what he owned, what he was doing in signing the will,

and the effect of his action. She also said that Pete did not appear to be under the influence of any drugs when he signed the will.

Jo Ellen Rater testified that she had known Pete for four years and did not believe that Pete could be made to do anything he did not want to do, and that his illness did not render him more easily influenced.

Joveta Forbis testified that she had known Pete for fifteen or twenty years and that Pete was not easily influenced by other people or coerced into doing something he did not want to do, even after he became ill.

Lana Osteen, the second witness to the 1993 will, testified that she had known Pete for fourteen years. Osteen also testified that Spiller gave Pete the will to read and Pete had a question about it, which Spiller and Pete discussed. She testified that Pete appeared to be mentally competent and did not appear to be drugged or drowsy. Last, Osteen said that she saw no indications that Pete was reluctant to sign the will or that Melba was making him sign something he did not want to sign.

Charles Pugh, Pete's pastor, testified that he had known Pete for four years and visited about once a week after Pete became ill. Pugh testified that although Pete was physically weak, he always appeared to understand everything that was going on around him and at no time did he appear to be groggy or hallucinating.

Following Pugh's testimony, Melba rested her case. The jury found that Pete lacked testamentary capacity to execute the 1993 will and that Melba had procured the will through undue influence. Melba's attorney requested a judgment n.o.v. on the issues of testamentary capacity and undue influence. The trial court granted the motion for judgment n.o.v. on the first issue, but allowed the jury verdict to stand on the issue of undue influence. Melba's counsel thereafter filed a motion for new trial on the issue of undue influence, which the trial court denied.

On appeal, Melba asserts that the trial court erred in denying her motions for a directed verdict, for judgment n.o.v., and for new trial because there was no evidence to support the jury's finding that the 1993 will was procured by undue influence. In a fourth point, she argues that the court erred in refusing her motion for new trial because the evidence was insufficient to support a finding of undue influence.

In addition, Appellees bring three cross-points on appeal. First, they argue that there was some evidence to support the jury's finding that Pete lacked testamentary capacity and thus the trial court should have denied Melba's motion for judgment n.o.v. on that issue. Second, they argue that the trial court erred in denying their motion for summary judgment because the will's self-proving affidavit was fatally defective. Last, they contend that the trial court's order granting Melba's motion for partial summary judgment on Appellees' petition for a constructive trust was improper. We turn first to Appellees' contention that the trial court erred in granting Melba's motion for judgment n.o.v. after the jury determined Pete lacked testamentary capacity.

## STANDARD OF REVIEW

A trial court may render judgment n.o.v. if a directed verdict would have been proper and may, upon motion and notice, disregard any jury finding on a question that has no support in the evidence. *See* Tex.R. Civ. P. 301. A directed verdict is proper only under limited circumstances: (1) a specifically indicated defect in the opponent's pleading makes it insufficient to support a judgment; (2) the evidence conclusively proves that the movant is entitled to judgment as a matter of law; or (3) the evidence is legally insufficient to raise an issue of fact. *See Boswell v. Farm & Home Sav. Ass'n*, 894 S.W.2d 761, 768 (Tex.App.—Fort Worth 1994, writ denied); *Rowland v. City of Corpus Christi*, 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.).

A motion for judgment n.o.v. should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990); *Rowe v. Rowe*, 887 S.W.2d 191, 195 (Tex.App.—Fort Worth 1994, writ denied). A judgment n.o.v.

will be affirmed if there was no evidence to support an issue, or conversely, the evidence established an issue as a matter of law. *See Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987); *Navarette v. Temple I.S.D.,* 706 S.W.2d 308, 309 (Tex.1986). "No evidence" exists and a directed verdict or a judgment n.o.v. should be entered when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990); *Rowe,* 887 S.W.2d at 196. There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *Rowe,* 887 S.W.2d at 196.

If more than a scintilla of competent evidence exists in support of the jury's finding, that finding must be upheld and the judgment n.o.v. will be reversed. *See Mancorp,* 802 S.W.2d at 228; *Navarette,* 706 S.W.2d at 309. In making the determination of whether there is more than a scintilla of evidence on which the jury could have made the finding, we must view the evidence in the light most favorable to the finding, considering only the evidence and inferences supporting the finding and rejecting the evidence and inferences contrary to the finding. *See Mancorp,* 802 S.W.2d at 227–28; *Navarette,* 706 S.W.2d at 309; *King v. Fisher,* 918 S.W.2d 108, 112 (Tex.App.—Fort Worth 1996, writ denied).

### TESTAMENTARY CAPACITY

In a will contest case filed after the will is admitted to probate, the burden of proof is on the party contesting the will to establish that the testator lacked testamentary capacity. *See Lee v. Lee,* 424 S.W.2d 609, 610 n. 1 (Tex.1968); *Click v. Sutton,* 438 S.W.2d 610, 612 (Tex.Civ.App.—San Antonio 1969, writ ref'd n.r.e.). Proof of testamenta-ry capacity requires a showing that at the time the will was executed, the testator had sufficient mental ability: (1) to understand the business in which he was engaged, i.e., the making of a will; (2) to understand the effect of making the will; (3) to understand the general nature and extent of his property; and (4) to know the natural objects of his bounty and the claims upon them. *See Tieken v. Midwestern State Univ.,* 912 S.W.2d 878, 882 (Tex.App.—Fort Worth 1995, no writ). The testator must also have had suffi-cient memory to collect in his mind the ele-ments of the business to be transacted and hold them long enough to form a reasonable judgment about them. *See id.*

In a will contest case, the proper inquiry is whether the testator had testamen-tary capacity on the day the will was execut-ed. *See Lee,* 424 S.W.2d at 611. Although this is the ultimate question, the court may also look to the testator's state of mind at other times if these times tend to show his state of mind on the day the will was execut-ed. *See id.; Chambers v. Chambers,* 542 S.W.2d 901, 907 (Tex.Civ.App.—Dallas 1976, no writ). Such evidence may be considered only if it demonstrates that a condition af-fecting the individual's testamentary capacity was persistent and likely present at the time the will was executed. *See Croucher v. Croucher,* 660 S.W.2d 55, 57 (Tex.1983). Thus, to successfully challenge a testator's mental capacity with circumstantial evidence from time periods other than the day on which the will was executed, the will contes-tants must first establish that the evidence offered indicates a lack of testamentary ca-pacity. *See id.* In addition, they must also demonstrate that the evidence is probative of the testator's capacity (or lack thereof) on the day the will was executed. *See id.* Fur-thermore, the evidence provided by the will contestants must be of a satisfactory and convincing character, and probate will not be set aside on the basis of evidence that creates only a suspicion of mental incapacity. *See Lee v. Lee,* 413 S.W.2d 931, 934 (Tex.Civ. App.—Fort Worth 1967), *aff'd in part, rev'd on other grounds in part,* 424 S.W.2d 609 (Tex.1968).

In the present case, there is no direct evidence that Pete lacked testamentary capacity on the day the will was executed. Nevertheless, Appellees contend that they conclusively established this fact through circumstantial evidence from days other than December 30, 1993. Specifically, they refer to the testimony at trial that tended to show that Pete was extremely ill on December 24, 1993, that the cancer had spread to his brain, that he was taking medication to control his pain, and that he hallucinated or was disoriented at times.

Evidence of physical infirmities, without more, does not tend to prove that a testator is incapable of knowing his family or his property, or understanding the effect of signing the will. The fact that a testator consumed pain medication on the day he executed the will in question is likewise insufficient to prove a lack of testamentary capacity, without some evidence that the medication rendered the testator incapable of knowing his family, his estate, or understanding the effect of his actions. In this case, Appellees offered no evidence that Pete's pain medication or physical problems impaired his testamentary capacity. As a result, the only evidence in this case that could possibly support the jury's finding that Pete lacked testamentary capacity is the testimony that Pete was hallucinating and disoriented at times.

As stated above, it is not enough to show that a testator lacked testamentary capacity on some days without also showing that the condition probably persisted on the day the will was executed. *See Croucher*, 660 S.W.2d at 57. In this case, although Appellees offered evidence at trial that Pete hallucinated or was "not himself" at times during the last month of his life, there was no evidence that these episodes were persistent. Furthermore, although Melba testified that Pete hallucinated at times, and Babe said that Pete sometimes "rambled" without making sense, the record is devoid of evidence that would allow the jury to reasonably conclude that Pete was experiencing hallucinations or was otherwise incapacitated *on the day the will was executed*. To the contrary, five witnesses offered uncontroverted testimony that on the day Pete executed the will, he was fully alert and in control of his mental capacities, and did not appear to be drowsy or medicated. In addition, Teresa Weaver, one of the will witnesses, testified that when Pete signed the will, he knew who his family was, what he owned, what he was doing in signing the will, and the effect of his action. Thus, in viewing all the evidence in the light most favorable to the jury's finding, we find there is no evidence that Pete lacked testamentary capacity at the time he executed the 1993 will. Because Appellees failed to carry their burden of proof, a directed verdict would have been proper at the conclusion of Appellees' case. As a result, we hold that the trial court did not err in granting the judgment n.o.v. Appellees' first cross-point is overruled.

## UNDUE INFLUENCE

With the question of the Pete's testamentary capacity settled, we turn to the issue of undue influence. In Melba's first point, she asserts that the trial judge erred in failing to grant her motion for a directed verdict on this issue. However, the law is well settled that a defendant who moves for a directed verdict after the plaintiff rests, but thereafter proceeds with her own case, waives her motion for directed verdict unless the motion is reurged at the close of her case. *See Jacobini v. Hall*, 719 S.W.2d 396, 398 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.); *Wenk v. City Nat'l Bank*, 613 S.W.2d 345, 348 (Tex.Civ.App.—Tyler 1981, no writ). In this case, Melba moved for a directed verdict after Appellees rested. The trial judge overruled the motion and Melba proceeded with her own witnesses. At the conclusion of the evidence, Melba did not reurge her motion for a directed verdict. Under these circumstances, she waived her motion for a directed verdict and her first point is thus overruled.

In Melba's second and third points, she asserts that the trial court erred in denying her motions for a judgment n.o.v. and a new trial on the issue of undue influence. Specifically, she contends that there was no evidence to support the jury's finding that she procured the 1993 will through undue influence. The burden of proving undue influence rests on the individual contesting the

will. *See Rothermel v. Duncan,* 369 S.W.2d 917, 922 (Tex.1963). The contestant must prove: (1) the resistance and exertion of an influence; (2) the effect of the influence was to subvert or overpower the mind of the testator at the time the will was executed; and (3) the execution of a will that the testator would not have executed but for such influence. *See id.*

It is important to note that not every influence exerted by one person on the will of another is undue. *See Long v. Long,* 133 Tex. 96, 125 S.W.2d 1034, 1035 (1939). An influence is not undue unless the free agency of the testator is destroyed and a testament is produced that expresses the will of the one exerting the influence rather than the will of the testator. *See id.* 125 S.W.2d at 1035–36. Thus, the will contestant must not only provide competent evidence that such influence in fact existed, but must also offer evidence of the testator's state of mind at the time the will was executed that would tend to show his free agency was overcome by such influence. *See Rothermel,* 369 S.W.2d at 922.

Generally, to establish the exertion of an undue influence, the relevant inquiry includes an examination of numerous factors, including whether the accused party had an opportunity to exercise the type of influence or deception that is alleged, the circumstances surrounding the drafting and execution of the will, and the existence of a fraudulent motive. *See id.* The court should also consider whether the will makes an unnatural disposition of property, considering the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence. *See id.* Other relevant factors are whether the testator has been habitually subjected to the control of the accused party, whether the testator was mentally or physically capable of resisting the accused party, the words and acts of the testator, and the weakness of the testator's mind and body. *See id.* As with a challenge to testamentary capacity, the circumstances relied on to establish undue influence must be of a reasonably satisfactory and convincing character, and must not be equally consistent with the absence of such influ-

ence. *See id.* "This is so because a solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside upon a bare suspicion of wrongdoing." *Id.* at 922–23.

In the present case, Appellees rely on circumstantial evidence to support their contention that Melba procured the 1993 will through undue influence. Specifically, they argue that the circumstances of the will's execution were suspicious because the will was signed at the Hortons's home rather than in the attorney's office, and because Pete did not read the will until five minutes before he signed it. Furthermore, they assert that Melba controlled Pete because she was Pete's primary caregiver and they lived alone in the country. Appellees also argue that Pete was under heavy medication at the time the will was executed, he was extremely ill, and the will made an unreasonable disposition of Pete's property that was inconsistent with his prior wills.

With Appellees' allegations in mind, we find the following passage from *Rothermel* to be instructive:

> It is the law in Texas that a will cannot be set aside on proof of facts which at the most do no more than show an opportunity to exercise influence. The establishment of the circumstances of having an opportunity to exert such influence due to being in a position of caring for the person upon whom the influence is supposed to be exerted is equally consistent with the theory of innocence as it is with the theory of wrongdoing. The exertion of influence that was undue cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show that influence was not only present but that *it was in fact exerted* with respect to the making of the testament itself.

*Id.* at 923 (emphasis added) (citations omitted).

The undisputed evidence in the present case established that Spiller, not Melba, suggested that the Hortons consider modifying the life estate provision in the 1991 will. The fact that Pete changed his will to leave all of

his property in fee simple to his wife of 20 years does not make the disposition of his estate unnatural. Furthermore, Pete provided for his sons in the 1993 will by including a contractual provision directing that whatever is left in Melba's estate at her death be divided equally between his two children and her two children. Moreover, although the evidence shows that the will was executed at the Hortons's home instead of their attorney's office, this is not an extraordinary occurrence and does not, without more, cast suspicion on the validity of the will.

The evidence also establishes that Pete had cancer and was in considerable pain most of the time. This evidence may be considered regarding his physical incapacity to resist or the susceptibility of his mind to an influence exerted. However, although the evidence indicates that Melba had opportunity to exert influence over her husband in the execution of the will, there is simply no evidence that she did so. Likewise, there is no evidence that would tend to prove that Pete's mind was in fact subverted at the time he executed the will.

Indeed, thirteen witnesses testified that despite his illness, Pete was headstrong, not easily swayed, and could not be coerced into doing something he did not want to do. Only Fillmore said that he *thought* Melba could influence Pete. However, mere speculation on this issue is not evidence that Melba actually exerted such influence over Pete or that Pete in fact submitted to such influence. Because there was no evidence to support the jury's finding that Melba procured the will through undue influence, the trial judge erred in denying Melba's motion for a judgment n.o.v. Accordingly, we sustain Melba's second point. We now turn to Appellees' remaining cross-points.

### APPEAL FROM DENIAL OF SUMMARY JUDGMENT

■■■ In their second cross-point, Appellees claim that the trial court erred in overruling their motion for summary judgment because the will's self-proving affidavit was invalid. In general, the denial of a motion for summary judgment is not a final judgment and therefore is not appealable.

*See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996); *Novak v. Stevens,* 596 S.W.2d 848, 849 (Tex.1980); *Givens v. Dougherty,* 663 S.W.2d 88, 89–90 (Tex. App.—Fort Worth 1983), *rev'd on other grounds,* 671 S.W.2d 877 (Tex.1984). Furthermore, where a motion for summary judgment is denied by the trial judge and the case is tried on its merits, the order denying the motion for summary judgment is not reviewable on appeal. *See Ackermann v. Vordenbaum,* 403 S.W.2d 362, 365 (Tex.1966); *Givens,* 663 S.W.2d at 89–90. In the instant case, a final judgment was rendered after a trial on the merits. The trial court's denial of Appellees' motion for summary judgment is not a matter for this court to consider on appeal and we overrule Appellees' second cross-point.

### CONSTRUCTIVE TRUST

■■■ In their third cross-point, Appellees contend that the trial court erred in granting Melba's motion for partial summary judgment on their petition for a constructive trust. Appellees assert that there were genuine issues of material fact that preclude a summary judgment on this issue. However, Appellees fail to state what those issues were or cite to any references in the record to support their contention. Under rules 38.1(h) and 38.2(a)(1) of the Texas Rules of Appellate Procedure, every brief must contain a clear, concise argument in support of its contentions, including appropriate citations to authorities and to the record. *See* Tex.R.App. P. 38.1(h) & 38.2(a)(1). By raising an issue and failing to present any argument or authority on that issue, the party waives that issue. *See Patton v. Saint Joseph's Hosp.,* 887 S.W.2d 233, 246 (Tex. App.—Fort Worth, writ denied) (construing former Texas Rule of Appellate Procedure 74(f)). Because Appellees' brief raises the mere assertion that summary judgment was improper and is devoid of any supporting argument or record references, they have waived the right to complain about this issue on appeal. Appellees' third cross-point is overruled.

## CONCLUSION

Because we find that (1) there was no evidence to support the jury's finding that Pete lacked testamentary capacity, (2) Appellees may not appeal the denial of a motion for summary judgment, and (3) Appellees failed to adequately brief their third cross-point, we overrule Appellees' first, second, and third cross-points. In addition, because Melba went forward with her case following her motion for a directed verdict on the issue of undue influence, we find that she waived that motion and thus her first point is overruled. However, because there is no evidence to support the jury's finding that Melba exerted undue influence in the execution of the will, we find that the trial court should have granted her motion for judgment n.o.v. on that issue and we sustain her second point.[1]

When we sustain a "no evidence" point, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. *See* TEX.R.APP. P. 43.3; *United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147 (Tex.1997); *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986) (quoting *National Life & Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969)). Accordingly, we affirm that portion of the trial court's judgment entering a judgment n.o.v. on the issue of testamentary capacity and denying Appellees' request for a constructive trust. We reverse the part of the trial court's judgment denying a judgment n.o.v. on the issue of undue influence, and we render judgment that the 1993 will be admitted to probate and letters testamentary be issued to Melba as independent executor.

---

1. In light of our holding, we need not reach Melba's third and fourth points.