In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00336-CV
_____

**BEATRICE PITRE, Appellant**

**V.**

**ROBERT FORWARD SR. INDEPENDENT EXECUTOR OF THE ESTATE
OF MARIE MAHATHY FORWARD, Appellee**

**On Appeal from the County Court
Jefferson County, Texas
Trial Cause No. 97905**

**MEMORANDUM OPINION**

This appeal involves a will contest concerning the estate of Marie Mahathy

Forward. Marie died on November 24, 2008, at the age of ninety-six years old.[1] On

December 4, 2008, Robert Forward Sr., Marie's son and appellee herein, filed an

application to probate Marie's will executed on November 22, 2002, which left

Marie's entire estate to Robert (the "2002 Will"). However, on December 16,

_____

[1]We note that the medical records and testimony at trial is inconsistent
regarding Marie's date of birth and thus her age at her death. However, because
both applications to probate Marie's will indicate that she died at ninety-six years
of age, we presume that to be her correct age at death.

1

2008, Marie's daughter, Beatrice Pitre, and appellant herein, filed an application to probate a will executed by Marie on October 17, 2008, which left Marie's entire estate to Beatrice (the "2008 Will"). Robert filed an objection to Beatrice's application, contesting the validity of the 2008 Will. The case was tried to a jury. Based on the jury's findings, the trial court rendered judgment that the will offered by Beatrice be denied probate. Beatrice filed a motion for new trial alleging that the evidence was factually insufficient to support the jury's verdict that Marie lacked testamentary capacity and was unduly influenced to execute a new will.[2] Because we do not find a signed order in the appellate record denying Beatrice's motion for new trial, we presume the motion for new trial was overruled by operation of law. Beatrice then filed this appeal. We conclude the evidence is sufficient to support the jury's findings, and we affirm the trial court's judgment.

## I. Preservation of Error

On appeal, Beatrice contends the evidence is legally and factually insufficient to support the jury's finding that Marie lacked testamentary capacity on the day she signed the 2008 Will or that Marie was unduly influenced by Beatrice to execute the 2008 Will. To preserve a legal sufficiency claim, a party

---

[2]The motion for new trial indicates Mary Pitre, not Beatrice Pitre, filed it. Mary Pitre is Beatrice's daughter; however, she is not a party to this lawsuit. We attribute this to a clerical error as no party has claimed error. We conclude that this clerical error has no bearing on the issues presented in this appeal.

2

must raise the complaint first with the trial court through a motion for directed verdict, a motion for JNOV, an objection to the submission of the question to the jury, a motion to disregard the jury's answer to a vital fact question, or a motion for new trial. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992); *Cecil v. Smith*, 804 S.W.2d 509, 510-11 (Tex. 1991). While Beatrice filed a motion for new trial, her motion argues only that the evidence is factually insufficient to support the jury's findings. Her motion does not contend that the evidence is legally insufficient to support the jury's findings. Our review of the record further reveals that Beatrice took none of the other actions identified above to preserve her legal sufficiency argument for our review. Accordingly, Beatrice has waived her challenge to the legal sufficiency of the evidence. *See* Tex. R. App. P. 33.1. We overrule Beatrice's contention that the evidence was legally insufficient to support the jury's finding that Marie lacked testamentary capacity or that Marie was under the influence of Beatrice when she executed the 2008 Will. Having overruled Beatrice's legal sufficiency contention, we now address whether the evidence is factually sufficient to support the jury's verdict.

## II. Standard of Review

When a party challenges the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.

3

*Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will consider all the evidence in the record, both in support of and contrary to the finding. *See id.* We will set aside the trial court's finding only if it is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See id.* Where there are disputed issues of fact, we give deference to the factfinder as it is the "sole judge[] of the credibility of the witnesses and the weight to be given their testimony." *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex. 1993).

### III. Testamentary Capacity

Beatrice complains that the evidence is factually insufficient to support the jury's finding that Marie lacked testamentary capacity on October 17, 2008 to sign a new will. Each party contends the other party had the burden of proof on this issue at trial. When a will is contested before it is admitted to probate, the proponent of the will bears the burden of establishing that the testatrix had testamentary capacity. *See Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983); *Schindler v. Schindler*, 119 S.W.3d 923, 931 (Tex. App.—Dallas 2003, pet. denied). The proponent of the will may make a prima facie case on this issue by introducing a will with a self-proving affidavit into evidence. *Schindler*, 119 S.W.3d at 931. At that point, the burden of producing evidence negating testamentary capacity shifts to the opponent of the will. *Id.* The burden of

4

persuasion, however, always remains with the proponent of the will. *In re Estate of Coleman*, 360 S.W.3d 606, 611 (Tex. App.—El Paso 2011, no pet.). Robert filed his contest to the 2008 Will before it was admitted to probate. Thus, Beatrice, as the proponent of the 2008 Will, had the burden of proof to establish that Marie had testamentary capacity at the time the 2008 Will was executed. Because the 2008 Will, which the trial court admitted into evidence, contained a self-proving affidavit, the burden of production shifted to Robert, as the contestant of the 2008 Will, to produce evidence to overcome Beatrice's prima facie case that Marie possessed testamentary capacity on the day she executed the 2008 Will. The burden of persuasion on the issue of testamentary capacity, however, remained with Beatrice at all times.

The Estates Code provides

a person of sound mind has the right and power to make a last will and testament if, at the time the will is made, the person:

    (1) is 18 years of age or older;
    (2) is or has been married; or
    (3) is a member of the armed forces of the United States, an auxiliary of the armed forces of the United States, or the United States Maritime Service.

Tex. Est. Code Ann. § 251.001 (West 2014).[3]

---

[3]When the probate court ruled on the matters at issue, the Texas Probate Code applied. Effective January 1, 2014, the Probate Code was repealed and was substantially replaced by the new Texas Estates Code. *See* Act of May 26, 2009, 81st Leg., R.S., ch. 680, 2009 Tex. Gen. Laws 1512, 1512-1732 (§§ 10-12 reflect

Being of "sound mind" means that a testatrix has testamentary capacity at the time she executed the will. *Chambers v. Chambers*, 542 S.W.2d 901, 906 (Tex. Civ. App.—Dallas 1976, no writ). A testatrix has testamentary capacity when she has sufficient mental ability: (1) to understand that she is making a will, (2) to understand the effect of making a will, (3) to understand the general nature and extent of her property; and (4) to know the natural objects of her bounty and the claims upon them. *Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.); *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex. App.—Fort Worth 1998, no pet.). The testatrix must have sufficient memory to collect in her mind the elements of the business to be transacted and hold them long enough to form a reasonable judgment about them. *Horton*, 965 S.W.2d at 85.

The question of testamentary capacity must be determined in light of the day and time the will was executed. *Long*, 196 S.W.3d at 464-65. When the factfinder

---

the effective date of the Texas Estates Code and the repeal of the Texas Probate Code), *amended by* Act of May 19, 2011, 82nd Leg., R.S., ch. 823, 2011 Tex. Gen. Laws 1901, 1901-2095; Act of May 9, 2013, 83rd Leg., R.S., ch. 161, art. 6, 2013 Tex. Gen. Laws 623, 633-657. Absent substantive changes between the two Codes, we cite to the Estates Code and rely on the Probate Code only when the savings provision of the Estate's Code, based on the decedent's date of death, makes a Probate Code section the controlling provision that governs the issues addressed in the Court's opinion.

finds adversely to the proponent of a will on the issue of testamentary capacity, and there is no direct testimony in the record of acts, demeanor, or a condition indicating that the testatrix lacked testamentary capacity on the day the will was executed, the testatrix's mental condition on that date may be determined from lay opinion testimony based upon the witnesses' observations of the testatrix's conduct either prior to or subsequent to the execution. *See Lee*, 424 S.W.2d at 611; *see also Schindler*, 119 S.W.3d at 931. However, evidence of the testatrix's state of mind at other times has probative force only if it demonstrates a condition affecting her testamentary capacity was persistent and likely present at the time the will was executed. *Croucher*, 660 S.W.2d at 57; *Lee*, 424 S.W.2d at 611.

The jury in this case heard conflicting testimony concerning Marie's mental and physical health during the weeks before her death. Below, we summarize the testimony and evidence relevant to our determination that Marie lacked testamentary capacity.

## A. Testimony of Marie's Attorney

Marie's attorney drafted both the 2002 Will and the 2008 Will. The attorney represented Marie for the last ten years of her life. He attended the same church as Marie and knew Marie and her family most of his life. After Marie became ill and moved in with Beatrice, her attorney visited her on occasion, but infrequently.

One day her attorney received a call from his pastor, who told him that Marie wanted to see him right away. Sometime in October 2008, her attorney went to Beatrice's home and spoke with Marie. Marie told him, "'I want to do something for my daughter.'" Marie repeated to him, "'My daughter, my daughter, my daughter.'" This was the extent of Marie's attorney's conversation with Marie. The attorney recognized this exchange as Marie's expression that she had had a change in attitude towards her daughter and wanted to change her will disposition to reflect this change. In response, the attorney prepared two versions of a new will for Marie to consider—the first version split Marie's estate between Robert and Beatrice equally, and the second version left all of Marie's estate to Beatrice. Marie did not specifically tell her attorney she wanted to leave everything to her daughter, but he wanted to give Marie that option. When the attorney returned to Beatrice's house, either no one was home or no one answered the door, so he left both versions of the new will in the mailbox.

From the attorney's perspective, to describe Marie's previous attitude toward Beatrice as "estranged" would be a "light characterization[.]" In 2002, Marie not only wanted to leave everything to Robert, but also wanted the 2002 Will to state that nothing would go to Beatrice. Although unaware of the details that created the rift between Marie and Beatrice, her attorney was aware that Marie was adamant that she wanted to leave everything to Robert and, if Robert should

not survive her, then to Robert's two children. Because her attorney did not know the extent of Marie's change of heart regarding the disposition of her estate in 2008, he prepared two versions of a will for her consideration. The attorney did not speak directly with Marie again about the two versions of the will he had left for her to consider. He did not return to the house to supervise the will's execution. Beatrice's daughter, Mary, paid the attorney for preparing the new will. The attorney did not see the executed copy of the 2008 Will until he gave his deposition in this case.

## B. Testimony of Annie Davis

Annie Davis witnessed Marie sign the 2008 Will and served as a witness to Marie's self-proving affidavit. Annie knew Marie her entire life and they were members of the same church. Annie visited Marie while she lived with Beatrice. Marie "was very alert" during Annie's visits, and did not appear to be "drugged[.]" Marie told Annie "she had to make a will and that she would probably be calling [Annie] to sign it."

Beatrice called Annie on October 17, 2008, and asked her to come over. Once Annie arrived, she was informed that there was going to be a will signing. Marie was present when Annie signed the self-proving affidavit. Annie perceived that Marie was alert, aware, and understood what was going on. Annie witnessed Marie sign her name to the will. Annie has no doubt that Marie knew she was

9

signing a will. Marie did not appear to be in any distress or pain when Annie witnessed the will signing. Annie did not know that Marie had been experiencing a lot of pain. Annie never saw Marie take medication and Marie did not seem to be in pain when Annie had previously visited her.

Annie attended Marie's birthday party in November. Marie was "excited over her birthday party." In Annie's opinion, Marie's health did not seem to have worsened since the day Annie had witnessed the signing of Marie's will in October. Annie was surprised when she heard that Marie died because Annie thought Marie was doing well.

## C. Testimony of Cecelia Williams

Cecelia Williams also witnessed Marie sign the 2008 Will and the self-proving affidavit. Cecelia knew Marie for fifty-four years. A friend of the family, Cecelia had gone to school with Beatrice's children. Cecelia regularly visited Marie, sometimes five days a week. To give Beatrice a break, Cecelia sat with Marie. Cecelia perceived that Marie understood what was going on in her life. Cecelia did not see Beatrice give Marie medication. In Cecelia's opinion, Marie was "always okay" and "[h]er mind was good and everything." Marie told Cecelia during one of their conversations that Marie had decided to change her will to leave everything to Beatrice. About two weeks before Marie signed the new will, Marie had asked Cecelia if she would be a witness for her. Cecelia watched Marie

read the 2008 Will, and Cecelia believes Marie was "in her right mind" and understood what she was doing when she signed the 2008 Will.

## D. Testimony of Deborah Frugie

Deborah Frugie is a friend of Beatrice and Mary. Deborah first met Marie shortly before Marie moved in with Beatrice in February 2008. Twice a month, Deborah visited Beatrice's house. Although Deborah could tell Marie was in pain and was obviously sick and dying, Deborah did not see Marie take any medications. During their visits, Deborah observed that Marie was in a "good state of mind." Deborah attended Marie's last birthday party in which Marie appeared to be "in good spirits" and able to recognize people by name.

## E. Testimony of Shera Batiste

Shera Batiste is also one of Mary's friends. Shera called Beatrice "mama[.]" While Beatrice was caring for Marie, Shera visited Beatrice's house almost every day. Shera saw Marie in pain and witnessed Beatrice give Marie medication for the pain. In Shera's opinion, Marie was not heavily medicated. On one or two occasions when Marie was taken to the doctor, the doctor indicated that Marie's family was not administering Marie's medication correctly. They had been giving Marie medication only as needed, but the doctor instructed that Marie should receive her medication every four to six hours to keep her from hurting so badly. Based on conversations Shera had had with Marie, Shera believed that Marie

11

recognized the people in her life. In Shera's opinion, Marie was lucid and in her "right mind" during her visits.

## F. Testimony of Sabrina Gatlin

Sabrina Gatlin is Robert's daughter and Marie's granddaughter. Sabrina grew close to Marie in 2008 when Marie became sick. Sabrina visited Marie at Beatrice's house on a regular basis until October 13, approximately six weeks before Marie died. While Sabrina never observed Marie take medication, Sabrina saw pill bottles in the room. Sabrina attended Marie's birthday party in November. According to Sabrina, Marie was alert at the party, but Sabrina was uncertain if she actually had a conversation with Marie on that day.

## G. Testimony of Robert Forward Sr.

Over the years, Robert and Beatrice's parents had to pay off multiple loans that they had cosigned for Beatrice and that she had failed to repay. Beatrice also charged retail items to her parents' accounts without their consent. In 2002, Marie brought a lawsuit against Beatrice to evict her from a house Marie owned and was renting to Beatrice.

According to Robert, Marie's and Beatrice's broken relationship ultimately caused Marie to disinherit Beatrice in both Marie's 1992 Will and her 2002 Will. After Marie had to file suit to evict Beatrice from the rental house, Marie said she

would never forgive Beatrice. While Robert does not believe Marie ever forgave Beatrice, he does believe that Marie loved Beatrice.

In 2008, Marie decided to go stay with Beatrice after Marie had been released from the hospital only because she did not want Robert to have to take care of her hygienic needs. Robert visited Marie about three days a week for the first three months after she had been released from the hospital. From June 2008 until mid-October, Robert visited Marie about every three days. Eventually, Robert started visiting Marie less often. Robert found it difficult to visit Marie because no one would answer the door at Beatrice's house. When Robert did visit, his visits were cut short because Marie was always sedated and then Beatrice would give Marie even more medication during his visits. Because of Marie's medicated state, she was unable to communicate with Robert during his visits. There was not a time when Robert visited Marie that "it wasn't time for [Marie's] medicine." Robert visited Marie in October and recalled that she was able to recognize him at that time. However, in Robert's opinion, Marie's ability to recognize her children was an "off-and-on thing." In late October 2008, when he and Beatrice argued in front of Marie, Marie recognized them and told them to stop fighting. After the incident between him and Beatrice, Robert stopped going to Beatrice's house.

Robert knew of no reason why Marie would have changed her will to disinherit him. Robert denied stealing rent proceeds from Marie and produced

13

account statements indicating that he had deposited the rental proceeds he received from Marie's renter into Marie's bank account as he had always done. Robert denied having had a falling out or dispute with Marie prior to her death. Robert believes he maintained an affectionate relationship with Marie until her death. Robert further believes that when Marie signed the 2008 Will, she did not understand that she was signing a will. Based on the condition that Robert would see Marie in when he visited her, Robert believes it was impossible for Marie to make a new will.

## H. Testimony of Robert Forward Jr.

Robert Forward Jr., Marie's grandson, likewise had a difficult time visiting Marie because he could not get in Beatrice's house. Robert Jr. visited with Marie in October 2008, and while she recognized him, Robert Jr. recalled Marie was not herself and that she appeared lethargic.

## I. Testimony of Beatrice Pitre

Beatrice was aware that she was not a beneficiary of Marie in her prior wills. Beatrice did not deny that Marie filed the lawsuit for forcible detainer against her in 1993 to evict her from property that Marie had been renting to Beatrice. Beatrice had not voluntarily left the property because she and her father had an agreement that she would get the property. It was her opinion that the lawsuit would never have happened if her father had remained in his right mind. According to Beatrice,

if hypothetically, she was forced to file a lawsuit against her daughter to evict her from a rental property, she would not then be mad at her daughter because she was a "real mother[.]" Beatrice did not deny that Marie's case against her went to trial and the judge ruled in Marie's favor.

Beatrice remembered that when Marie's attorney came out of the room after visiting with Marie, he told Beatrice that he had made a will that split Marie's estate between Beatrice and Robert, but that Marie told him she wanted to leave everything to Beatrice and completely disinherit Robert. However, as discussed above, the attorney's recollection of these events do not corroborate Beatrice's recollection.

Beatrice does not deny that she saw the two different versions of the will that the attorney had drawn up for Marie. She recognized that one of the wills completely disinherited Robert and left all of the property to her, while the other will disposed of Marie's property equally between her and Robert. She thought she threw away the will that left the property to them equally. Beatrice was aware that Marie executed the 2008 Will while she was suffering from lung cancer, but contends that Marie was not in any pain the day she signed the 2008 Will. Beatrice disagrees with the nurse's progress report dated October 21, 2008, that indicated Marie seemed confused and disoriented.

According to Beatrice, Marie gave Beatrice a signed check with "daughter" written on it. Marie told Beatrice, "I am on my way out. You['re] going to get every dime." However, Beatrice admitted that the check from Marie was only intended to allow Beatrice to withdraw all the money out of one of Marie's bank accounts. After Beatrice secured Marie's power of attorney, she removed the money from two of Marie's bank accounts and placed the money in accounts that provided Beatrice with survivorship benefits. Beatrice removed the money and placed it into an account she controlled because she was afraid, after what she had been through with her dad, that she would not have any financial support for Marie.

Beatrice's relationship with Marie started healing a year before Marie became ill. In Beatrice's opinion, from the time Marie left the hospital in February 2008 until she passed away, Marie was able to recognize her children and grandchildren. Beatrice also believes that Marie understood the types of houses, properties, and bank accounts she owned.

According to Beatrice, during Marie's illness, Marie had asked Beatrice to force one of Marie's renters off the rental property for failure to pay rent. Beatrice went to the property and spoke with the renter, and the renter told her that she had paid Robert a portion of the rent owed. The renter came by the house and spoke with Marie about the rent. Beatrice contends that after speaking to the renter, Marie

became angry with Robert because she believed he was stealing rent money from her.

**J. Marie's Medical Records**

Marie's medical records were admitted into evidence. Marie was diagnosed with metastatic lung cancer on August 26, 2008. On September 23, 2008, Marie was evaluated by her general practitioner. Marie told her doctor that she was in constant pain all over her body. She described the severity of the pain as an eight, on a scale of one-to-ten. Marie had been experiencing this pain for weeks. She was actively taking Darvocet and Vicodin for pain.

Marie saw an oncologist on September 25, 2008. The oncologist noted that Marie was very difficult for her daughter to manage. The oncologist further noted, "The patient's daughter says that she is extremely difficult to manage and in pain a lot of the times, complaining of nausea and vomiting. She is very restless, she is up and down in and out of bed." According to Beatrice, this reference in the medical report concerned her inability to manage Marie's pain.

On October 2, 2008, Marie saw a radiation oncologist for consideration of palliative radiation therapy. Marie told her doctor that "the pain in her back comes and goes, but when she does hurt, she rates it as a 10/10 on a pain scale." The doctor noted that it "is particularly painful when [Marie] lies on her back." Marie was taking morphine and hydrocodone for the pain. He noted that Marie's regimen

17

for taking her pain medication was unclear, and that Marie appeared reluctant to use morphine for fear of addiction.

Marie was evaluated further for radiation therapy on October 6, 2008, and October 7, 2008. On each of these days, Marie was experiencing a "significant amount of pain." Marie saw her oncologist on October 9, 2008. Marie's oncologist noted that the family had not previously understood they were to administer morphine to Marie to help control her pain. Marie's oncologist took "great caution to explain that [Marie] has severe pain as a result of a destructive soft tissue tumor that requires potent pain medication and that she should be treated appropriately." Marie told the doctor that she was still experiencing quite a bit of pain. Included with her oncologist's report was a Medication Reconciliation Form from Julie and Ben Rogers Cancer Institute, dated October 9, 2008. The form identified the different medications prescribed to Marie, which included Darvocet, hydrocodone, and two different types of morphine. Marie's oncologist indicated that Marie's family agreed with the treatment plan.

Marie received her first treatment of radiation therapy on October 13, 2008. By October 16, 2008, Marie had received her fourth radiation therapy treatment and the doctor notes that "[h]er pain location has gotten better." However, the nurse's progress report dated October 21, 2008 states, "Yesterday [Marie's] condition seemed to be deteriorating. She had no strength in her legs, she seemed

18

confused and disoriented." By October 23, 2008, Marie had received her ninth radiation therapy treatment, and the physician noted that the pain that they were targeting for radiation therapy had been stable for the last week and was not worsening. The doctor further noted that "the pain medication MS Contin has been helping her to control the pain" and that Marie denied any other worsening of symptoms. However, the nurse's progress report dated October 29, 2008, indicates that Marie was again "in a lot of pain" and could not come in for treatment. Beatrice agreed that what the medical records reflected was true.

The jury heard conflicting evidence regarding Marie's testamentary capacity. According to Beatrice, when Marie's attorney finished visiting with Marie, he told Beatrice that he had drafted a will that split Marie's estate between Beatrice and Robert, but that Marie had just told him that she wanted to leave everything to Beatrice and completely disinherit Robert. However, according to the attorney, the extent of his conversation with Marie was that she stated, "'I want to do something for my daughter'" and then simply repeated the words, "'My daughter, my daughter, my daughter.'" Moreover, according to the attorney, he did not speak to Marie about the new wills after he had drafted them. Whereas Beatrice suggested that the attorney spoke to Marie about her will after he had drafted a will leaving her estate equally between Beatrice and Robert. The attorney's testimony does not corroborate the story that Beatrice told the jury. Moreover, the attorney

admitted that from his limited conversation with Marie, he was unable to determine Marie's testamentary wishes, which is why he drafted two versions of a will that he later placed in Beatrice's mailbox. Beatrice admitted that she saw the two different versions of the will and knew their content. Beatrice admitted she thought she threw away the will that divided the property equally. However, Beatrice did not explain why she threw away one of the wills, and did not claim that Marie instructed her to throw away the version of the will that split Marie's estate equally between Beatrice and Robert.

While both witnesses to the 2008 Will believe Marie understood she was signing a will, neither witness indicated that Marie knew her family or the extent of her property on the day she signed the new will. Beatrice believes Marie was able to recognize her children and grandchildren. She believes Marie understood the types of houses, properties, and bank accounts she owned. Additional witnesses also indicated their general belief that Marie was in a good state of mind and continued to recognize people. However, Robert believes that Marie's ability to recognize her children during the month of October was at best an "off-and-on thing." When Robert visited Marie every three days between the months of June and mid-October 2008, Marie was so sedated that she could not communicate with him. Robert did not believe Marie understood she was signing a will when she

executed the 2008 Will on October 17, 2008. Robert further believes she was incapable of executing a new will in her condition.

The medical records and testimony indicate that Marie had reached the terminal stage of her illness. Just a few days after she had executed the 2008 Will, the medical records indicate she was confused and disoriented. The medical records and testimony indicate that Marie was regularly being given a number of narcotics for her pain. In fact, a little over a week before Marie executed the 2008 Will, Marie's physician noted that the family had not been giving Marie her medication correctly, and the physician instructed the family to give Marie more pain medication to adequately treat her pain. Thereafter, Beatrice gave Marie her medication as instructed.

The jury heard a number of contradictions from Beatrice and her witnesses regarding the amount of pain or amount of medication that Marie was being given. Beatrice agreed that Marie was suffering from lung cancer, but denied Marie was in any pain the day she signed the 2008 Will. Beatrice further agreed with portions of Marie's medical records, but disagreed with the medical records that indicated Marie was confused and disoriented.

It was the jury's responsibility to judge the credibility of the witnesses and determine the weight to be given their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The jury could choose to disbelieve Beatrice and her

21

witnesses regarding Marie's state of mind when she executed the 2008 Will. *See id.* The jury could have considered that Marie's pain medication affected her mental condition to the extent that she was sedated and unable to communicate. As the factfinder, the jury resolved the conflicts between the testimony regarding Marie's testamentary capacity, and it is not this Court's role to replace the jury's determination with our own opinion, which may be contrary. *See id.* at 819-21. We conclude there is evidence in the record from which a jury could reasonably conclude that Marie's physical and mental condition had deteriorated to a point where she no longer had testamentary capacity. Considering all of the evidence, we cannot say the evidence supporting the jury's finding that Marie lacked testamentary capacity to sign the 2008 Will was so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. We resolve this issue against Beatrice and affirm the trial court's judgment. Because we have affirmed the judgment based on the jury's finding of lack of testamentary capacity, we need not address Beatrice's undue influence argument. *See* Tex. R. App. P. 47.1.

AFFIRMED.

_____
CHARLES KREGER
Justice


Submitted on March 18, 2014
Opinion Delivered July 24, 2014
Before McKeithen, C.J., Kreger and Horton, JJ.