COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | | |
|---|---|---|---|
| IN RE | § | No. 08-19-00011-CV | |
| THE ESTATE OF | § | Appeal from the Probate Court No. 2 | |
| BUFORD SCOTT, JR., DECEASED | § | of Tarrant County, Texas | |
| Appellant. | § | (TC# 2015PR02393-2-A) | |

## **O P I N I O N**

This is a will contest. Actually, it is a wills contest (plural) because three wills are at issue and a jury found two were signed without testamentary capacity, and all three were signed as the result of undue influence. The decedent and maker of the wills is Buford Scott, Jr. (Buford). The proponents of the wills are the Appellants here, Geoffrey Tait and Irene Rueda. The antagonists of the wills, and Appellees here, are John Paul Scott, III and Vinnie V. Dungan. The jury also found that the will proponents did not act in good faith in opposing the will contest, and that they were therefore not entitled to attorney's fees. On appeal, the will proponents argue that the evidence was both factually and legally insufficient to support the jury's findings. Because we find sufficient evidence to support the jury's finding that all three wills were signed as the result of undue influence, and that Appellants did not act in good faith in defending the wills, we affirm. Our view of the undue influence findings means that we need not address challenges to the jury's

testamentary capacity findings, or a question on revocation of one of the wills. It does mean, however, that we need to supply the reader with a detailed recitation of the evidence.

## I. BACKGROUND

### A. Factual Background

Buford Scott, Jr., who never married and had no children, grew up on a ranch in Cresson, Texas, where he lived until his death in August of 2015. For most of his life Buford lived a sheltered existence with his immediate family members. Buford who had a below average IQ and some cognitive impairments, did not graduate from high school until he was 22 years old, and was never regularly employed outside of working on his family's ranch. His parents and his only sibling predeceased him, each dying intestate. When his mother passed away in 2003 or 2004, Buford inherited a substantial estate, but was left to live alone on the ranch.

#### 1. The Creation of the management trust in 2008

After Buford's mother passed away, his mother's attorney expressed concern about Buford's ability to live on his own, and thereafter initiated a guardianship proceeding in the Hood County Court. In 2007, that court appointed both a guardian ad litem and an attorney ad litem to represent Buford's interests. The guardian ad litem filed an application to place Buford under a guardianship management trust pursuant to the then applicable Section 867 of the Texas Probate Code.[1] The court ordered Buford to undergo a mental health evaluation by Dr. Larry Padget, a local general practitioner, who determined that Buford was "mentally retarded," and suffered from substance or alcohol abuse or both.[2] Dr. Padget further reported that Buford was unable to make

---

[1] The Texas Probate Code was repealed and replaced with the Texas Estates Code by Act of June 17, 2011, 82nd Leg., R.S., ch. 823, 2011 Tex.Gen.Laws 1901. The current Code provision relating to management trusts is found in Chapter 1301 of the Texas Estates Code. *See* TEX.EST.CODE ANN. § 1301.051, et. seq.

[2] The Diagnostic and Statistical Manual for Mental Disorders (DSM-5) now uses the term intellectual disability. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 5th ed. (2013).

2

his own financial, medical, or other decisions, and was totally incapacitated. The court agreed, and issued an order creating a management trust, expressly finding that Buford was "completely without capacity as provided by the Texas Probate Code to manage his property[.]" The court placed all of Buford's assets into a trust managed by a local bank.

Upset about the bank's control of his money, Buford retained an attorney who filed a motion to set aside the trust on Buford's behalf in March of 2009. The motion attacked the court's order creating the trust on several procedural grounds, including that the court did not follow the proper procedures in appointing the guardian ad litem or in making its determination that Buford was incapacitated. The court thereafter replaced Buford's guardian ad litem with a new ad litem who requested a psychiatric report to determine Buford's mental capacity. The court granted the request and appointed psychiatrist Dr. Lisa Clayton to perform the psychiatric evaluation.

### 2. Dr. Clayton's psychiatric report

Dr. Clayton evaluated Buford on February 22, 2010. In her report, Dr. Clayton noted that Buford admitted that he had not taken very good care of his financial affairs after his mother died, and that he "did need help" with his finances. Although she disagreed with Dr. Padget's assessment that Buford was "mentally retarded," she believed that Buford's IQ was below average, that he suffered from learning disabilities, and evidenced various cognitive impairments. He also exhibited some degree of paranoia, poor insight, and impaired personal judgment. Dr. Clayton concluded that Buford was unable to take care of himself independently, noting, among other things, that Buford had rotting teeth, did not have a primary care doctor, and did not appear to be well-groomed. In addition, she concluded that Buford was "extremely susceptible to the manipulation and control by others" due in part to his below average intelligence and paranoid

---

*See also Ex parte Cathey*, 451 S.W.3d 1, 11 n.23 (Tex.Crim.App. 2014) (noting change from "mental retardation" to "intellectual disability" by the American Association on Intellectual and Developmental Disabilities).

3

tendencies. She noted that Buford had previously been manipulated by an individual who convinced him to pay for assistance in obtaining some unclaimed property located in Oklahoma. In her report, Dr. Clayton advised the court that she believed Buford was "partially incapacitated" and needed a partial guardianship with regard to managing his financial and business affairs.

### 3. The August 2011 settlement agreement

In August of 2011, Buford settled the dispute raised in his pending motion to terminate the management trust. He agreed to allow the management trust to continue with modifications, which allowed him to retain his personal property and to open his own bank account. The bank trustee agreed to pay Buford $800.00 a week for his personal use. The agreement further stated that the "temporary guardianship" under which Buford had been placed was to be dismissed, as were all court appointees.

### 4. Buford hires Geoffrey Tait and Irene Rueda

Despite signing the settlement agreement, Buford continued to be dissatisfied with the bank's control of his assets. After unsuccessfully asking his friends for assistance, in June 2012 Buford contacted a private investigator, Geoffrey Tait, whose name he found in a phone book. Tait, and his assistant, Irene Rueda, agreed to assist Buford with his efforts to have the management trust lifted. In addition, Tait and Rueda soon began providing Buford with other services, including cleaning, cooking, bill paying, shopping, and running errands. In fact, Rueda testified that she saw Buford almost every day for three years until his death in August of 2015. During these three years, Tait and Rueda submitted numerous invoices to Buford, billing him tens of thousands of dollars for their investigation and other services. In addition, Buford gave both Tait, Rueda, and their family members bonuses and gifts, including a $5,000.00 gift to Tait's wife, despite the fact that Buford had admittedly never met his wife. In addition, the record contains

4

evidence that Buford made large cash withdrawals from his account during the time that Tait and Rueda were providing services to him, some of which were signed by Tait, acting on Buford's behalf.

### 5. *The March 23, 2013 Holographic Will*

Buford did not have a will when he first met Tait and Rueda, and as early as August 2012, Tait began discussing the need for Buford to sign various legal documents, including a will, a trust instrument, and a power of attorney. In February of 2013, Tait contacted attorney Scott Moseley to discuss the possibility of hiring him to assist Buford with lifting the management trust, and with drafting a will or trust documents for Buford to sign. During one of their discussions, Moseley informed Tait that Buford could draft a handwritten holographic will, rather than a formal will, and further explained to Tait the legal requirements for making such a will.[3]

On March 23, 2013, Buford signed a three-page will that was all in his own handwriting. That document stated that he wished to create the "Buford Scott, Jr., Charitable Trust," in which all of his assets would be placed at the time of his death. In the will, Buford stated that he was aware that he had cousins, uncles and aunts, but that he did not wish to leave any of his money or property to them. At the time, Buford actually did not have any living aunts and uncles, but he did have cousins. He was upset with the cousins as he believed they had either initiated or participated in the earlier guardianship proceedings, and that they were trying to take his money.[4]

---

[3] Although a will must typically be signed by a testator in the presence of two witnesses, who must then subscribe their names to the will, a holographic will need not be so witnessed. TEX.EST.CODE ANN. §§ 251.051, 251.052. Thus, if an instrument is wholly in the testator's handwriting and signed by the testator, with the intent to dispose of his property, the will is generally considered to be valid. *See Lemus v. Aguilar*, 491 S.W.3d 51, 56 (Tex.App.-- San Antonio 2016, no pet.).

[4] Although there is no evidence that Buford's cousins actively sought the guardianship, there is evidence that some of them spoke with the guardian ad litem about the court proceedings and that some of them, including the two will contestants, may have attended court hearings in the guardianship case.

On the same day that Buford signed the will, Tait emailed a copy of it to Moseley, asking if it met the legal requirements for a holographic will. Moseley responded that although the will appeared to comply with the basic legal requirements for a holographic will, he believed that the will could be improved by naming an executor or trustee, and by naming the charity or charities that Buford wished to benefit by the proposed trust. Moseley offered to assist Buford by drafting a "formal will" for him, and in particular, recommended the creation of a trust with a pour over will. The original of the Holographic Will was never found, and Appellants later used the copy sent to attorney Moseley as proof that it was made.

A short time later, Tait advised Moseley that Buford had "added a lot more to his will" and that he would "have him finish his holographic will" and send it to Moseley for review. In addition, Tait advised Moseley that he had already drafted yet another will--presumably a formal one--for Buford to sign after the management trust was lifted, together with trust documents which would create a new trust into which all of Buford's assets were to be transferred. Moseley ultimately declined to represent Buford. Tait thereafter contacted attorney Pam Walker, and in March of 2014, she agreed to assist Buford with filing an application to restore him to full legal capacity.

### 6. The management trust is lifted in November of 2014

Tait contacted two psychologists, Drs. Earl Johnson and Stephen Karten, as well as a psychiatrist, Dr. Jeffrey Schlueter, to conduct mental status evaluations of Buford in aid of establishing that he was not in need of a management trust or a guardianship. In their written reports, all three experts agreed that despite Buford's below-average IQ, Buford was not incapacitated and had sufficient mental capacity to make his own financial, medical and other decisions. Based on these reports, on November 4, 2014 the trial court restored Buford to full

6

legal capacity. Thereafter, attorney Walker suggested that Buford create a formal will, but Tait sent an email to Walker, stating that Buford did not need her assistance, as he (Tait) had already prepared a will for Buford to sign. Tait explained he had downloaded a will template from the internet and that he was "working on" convincing Buford to sign the will as well as various trust documents that he had also prepared. Although Tait indicated that he would bring the will and trust documents for Walker to review, Walker stated that Tait never did and that he essentially "disappeared" after the management trust was lifted.

A month later, Buford signed a "Limited Power of Attorney" giving Tait the right to make personal, financial, and other decisions on Buford's behalf.

### 7. The July 10, 2015 "Annie Green Will"

In early July of 2015, both Tait and Rueda noticed that Buford lost a significant amount of weight and they became concerned about his health. At that time, Tait drafted a will for Buford to sign, using a will template that he had obtained some years earlier. On July 10, 2015, Tait videotaped Buford at his home signing the will; however, Tait failed to arrange for a notary public or for any individuals to be present to witness Buford's signature. Despite being a notary public himself, and admittedly knowing that it was against the rules, Tait took the will to notary Annie Green and asked her to notarize it for him. She refused.

Although the parties discussed the so-called "Annie Green Will" at trial, neither the will nor the videotape recording was introduced at trial. Tait claimed that the recording had inadvertently been destroyed due to problems with Rueda's computer where it had been stored. However, Tait testified that the "Annie Green Will" made substantially the same bequests as did the next two wills that Buford signed in July and August of 2015, both of which are described below, and both of which left significant bequests to Tait and Rueda.

*8. The July 21, 2015 Will*

Buford was admitted to the hospital on July 19, 2015 and diagnosed with terminal esophageal cancer; he died a month later.   On his second day at the hospital (July 21, 2015) Buford signed another will that Tait had drafted (the "July Will").   Tait was unable to produce a copy of the July Will, and stated that he believed it was destroyed when Buford signed his last and final will the next month.   However, Tait videotaped the signing of the July Will, and that videotape was played for the jury.   In the videotape, Buford is seen lying in a hospital bed as Tait summarized the terms of the will.   In his summary, Tait told Buford: "You've made bequests to several different people, you've made bequests to me, you've made bequests to [Rueda] [and] you've made the majority of your bequests to the Buford Scott Charitable Trust, right?"   Buford agreed, and Tait next confirmed that Buford was not leaving anything to his cousins.   Buford then explained that he believed his cousins had attended two hearings when the court was considering whether to place his assets in the management trust, and he faulted them for not opposing the trust and for allowing the judge to take his property away from him.

*9. The August 13, 2015 Will*

Tait next consulted with another attorney, Paul Wieneskie, regarding the validity of the July Will, and was told that although the will was valid, it would have been preferable to include a self-proving affidavit, and to have included more specificity with regard to the creation of the charitable trust.   Tait subsequently revised the will to include the affidavit and to "[add] more meat to the charitable trust" provisions.   Tait arranged for another formal will signing on August 13, 2015, while Buford was in an assisted nursing facility.   According to Tait, the July and August Wills were virtually identical to each other with the two exceptions discussed above.

Although Tait did not videotape the entire signing of the August Will, he did conduct a videotaped interview with Buford afterwards. In this videotape, Buford acknowledged his awareness of the will's provisions. Tait then summarized the provisions of the will, stating that Buford had left a "large bequest" to the Charitable Trust, to be distributed in accordance with Buford's wishes, and that he had also "left things" to Tait, Rueda, and five others mentioned in the will. Buford expressly denied being coerced into signing the will, and stated that he had intentionally not left anything to his cousins because "they didn't want me to have a country to live in," further explaining that he believed his cousins had supported the court in taking away his rights when the management trust was imposed.

The August Will, which revoked all prior wills and named Tait as Executor, requested that Tait create "The Buford Scott, Jr. Charitable Trust, or the Buford Scott, Jr. Charitable Foundation." Tait was named as the "initial and permanent Trustee, Administrator, Executive or overseer of whatever such business he shall create, until such time as he is replaced by death or operation of law." It further stated that Tait "shall have the sole and final authority to determine what type of business entity . . . shall be formed and what provisions it shall include, so long as it fulfills my desire to provide help to people who face an unfair judicial system, or incompetent and unscrupulous lawyers." The will provided that the Charitable Trust was to be funded by certain mineral and leasing rights that Buford owned in both Texas and Oklahoma. The record contains evidence that Tait was aware at the time Buford signed the August Will that the leasing rights were not producing, and that they were valued at only $32,500.00.

With the exception of Buford's household furniture and clothing, which he gave to Goodwill, the August Will gave Tait and Rueda all of his real property and his personal property, in addition to $350,000 in cash to Tait, and $200,000 in cash to Rueda. The Will further named

9

Rueda's children and Tait's wife as alternate beneficiaries in the event they predeceased him. In the will, Buford stated that the bequests were made to Tait and Rueda, due to his gratitude to them for assisting him with his legal problems and for helping him through his final illness. The bequests given to Rueda and Tait in the August Will were valued at approximately 2.4 million dollars.

And finally, Buford included a paragraph expressly disinheriting his cousins, stating that he was doing so because they had failed to speak up on his behalf during the guardianship proceedings, and had allowed the Hood County Court to set up the management trust. Buford died five days after he signed the August Will. Buford's cousins, however, were unaware of Buford's death until several months later when Tait returned one of their calls to tell them of his passing.

## B. Procedural History

After Buford's death, Tait submitted the August Will to probate, and the court named him as executor of Buford's estate.[5] Upon learning of the court proceedings, Buford's cousins, John Paul Scott, III and Vinnie Dungan, filed a petition to contest the will. The petition alleged that Buford lacked the requisite testamentary capacity to sign the August Will and that he had been "unduly influenced" into signing it by Tait and Rueda. They sought a declaration that the will was invalid and that Buford had died intestate. As the cousins were Buford's only remaining family members, if Buford died intestate, his entire estate would pass to them under the Texas intestate succession laws. TEX.EST.CODE ANN. § 201.001. Tait and Rueda thereafter filed a

---

[5] Although Tait and Rueda were given all of Buford's real property in the August Will, they nevertheless billed the estate for thousands of dollars as "property management fees" for their efforts in cleaning up the property

conditional counterapplication seeking to admit the July Will or the March 2013 Holographic Will to probate in the event that the August Will was found to be invalid.

The matter was tried to a jury that found:

1. Buford lacked testamentary capacity to sign the August 13, 2015 will, and signed it as the result of undue influence.

2. Buford lacked testamentary capacity to sign the July 21, 2015 will, and signed it as the result of undue influence.

3. Buford had testamentary capacity to sign the March 23, 2013 Holographic Will, but signed it as the result of undue influence. The jury otherwise found that the Holographic Will was wholly in Buford's handwriting, and was intended to dispose of his property.

4. Buford subsequently revoked the March 23, 2013 Holographic Will.

5. Tait and Rueda did not act in good faith or with just cause in submitting the wills to probate or defending the wills during the will contest proceedings.

The trial court's final judgment declared all three wills invalid and denied probate as to each of them. The court further denied Tait and Rueda's request for attorney's fees and expenses in defending against the will contest.

On appeal Tait and Rueda (hereinafter Appellants) raise 17 issues, contending that the evidence is both legally and factually insufficient to support any of the jury's findings as summarized above. We distill Appellants' arguments into three broad categories, starting with the jury's findings with respect to (1) the validity of the March 2013 Holographic Will, (2) the validity of the July and August Wills, and (3) the jury's finding that Appellants did not act in good faith in submitting the wills to probate and/or in defending against the will contest.

As Appellants arguments all turn on challenges to either the legal or factual sufficiency of the evidence to support the jury's findings, we start with our standard of review.

11

## II.  STANDARD OF REVIEW

A legal insufficiency challenge claims that there is "no evidence" to support a finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).  We sustain a legal sufficiency challenge only if the "record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact."  *Id.* at 810.  In reviewing the record for legal sufficiency, we credit the evidence favorable to the judgment if a reasonable fact finder could, disregard contrary evidence unless a reasonable fact finder could not, and reverse the fact finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded fact finder to reach the judgment under review.  *Id*. at 827.

Appellants also raise factual sufficiency challenges.  When considering a factual sufficiency challenge brought by a party without the burden of proof at trial, we consider all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust.  *City of El Paso v. Parsons*, 353 S.W.3d 215, 225 (Tex.App.--El Paso 2011, no pet.), *citing Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (requiring appellate court that overturns a verdict on factual insufficiency grounds to explain why evidentiary discrepancy is "manifestly unjust; why it shocks the conscience; or clearly demonstrates bias").

Under either standard, the jury is the sole judge of the credibility of witnesses and the weight to be given their testimony.  *Parsons*, 353 S.W.3d at 225.  The jury may choose to believe one witness and disbelieve another, and we must not impose our opinion to the contrary.  *Id.*,

12

*citing City of Keller*, 168 S.W.3d at 819. The inferences drawn from the evidence are also within the province of the jury, and we must assume that the jurors made all inferences in favor of the verdict if reasonable minds could do so and disregard all other inferences not so drawn. *Id.* at 820-21. "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* at 822.

## III. DISCUSSION

### A. The Validity of the March 2013 Holographic Will

In Issues Two through Four, Appellants contend that there was both legally and factually insufficient evidence to support the jury's finding that Buford was unduly influenced into signing the March 2013 Holographic Will. In addition, Appellants argue in Issue One that the record contains no evidence to support the jury's finding that Buford subsequently revoked the Holographic Will. If we conclude that there was sufficient evidence to support the jury's finding on undue influence, we need not reach the issue of whether Buford revoked the Holographic Will. We therefore start with whether the Holographic Will was signed as the result of undue influence.

#### 1. *The law on undue influence*

Generally, the term undue influence describes "such influence or dominion as exercised at the time, under the facts and circumstances of the case, which destroys the free agency of the testator, and substitutes in the place thereof the will of another." *Long v. Long*, 125 S.W.2d 1034, 1035 (Tex. 1939). As this Court has recognized, "[t]he exercise of undue influence may be accomplished in many different ways--directly and forcibly, as at the point of a gun; but also by fraud, deceit, artifice and indirection; by subtle and devious, but none-the-less forcible and

13

effective means." *In re Olsson's Estate*, 344 S.W.2d 171, 173-74 (Tex.Civ.App.--El Paso 1961, writ ref'd n.r.e.). Or as the Texas Supreme Court stated, undue influence may take the form of "force, intimidation, duress, excessive importunity or deception used in an effort to overcome or subvert the will of the maker of the testament and induce the execution thereof contrary to his will." *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963).

To prove undue influence, the contestant must convince the fact finder of: (1) the existence and exertion of an influence; (2) that the influence subverted or overpowered the mind of the testator at the time of the execution of the testament; and (3) the maker would not have executed the testament but for that influence. *Id.* The burden is upon the contestant to prove each of these allegations by a preponderance of the evidence. *Woods' Estate*, 542 S.W.2d 845, 846 (Tex. 1976); *see also Matter of Kam*, 484 S.W.3d 642, 651-53 (Tex.App.--El Paso 2016, pet. denied) (recognizing that once evidence established that will was signed in compliance with all statutory requirements, the burden shifted to will contestant to establish that the will should be voided as the product of undue influence).

Undue influence can be established by direct or circumstantial evidence. *Olsson's Estate*, 344 S.W.2d at 175; *see also Rothermel*, 369 S.W.2d at 922 (recognizing that undue influence may be proven by direct or circumstantial evidence). However, when relying on circumstantial evidence, the evidence must be of a "reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of such influence." *Rothermel*, 369 S.W.2d at 922. "This is so because a solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside upon a bare suspicion of wrongdoing." *Id*. at 922-23. Because undue influence may be part of a continuing scheme, the jury may consider

events occurring both before and after the will execution. *Id.* at 922 (recognizing that proof of undue influence often involves an "extended course of dealings and circumstances").

Some evidence, however, falls short of the mark. "Mere requests or efforts to execute a favorable instrument are not sufficient to establish undue influence unless the requests or efforts are so excessive so as to subvert the will of the maker." *Matter of Kam*, 484 S.W.3d at 652, *quoting In re Estate of Clifton,* No. 13-11-00462-CV, 2012 WL 3139864, at *2 (Tex.App.--Corpus Christi Aug. 2, 2012, no pet.) (mem. op., not designated for publication). Similarly, the fact that an individual had the opportunity to influence the testator, such as by being the testator's caregiver, is insufficient to establish undue influence. *Rothermel*, 369 S.W.2d at 923; *see also Woods' Estate*, 542 S.W.2d at 848.

In *Rothermel,* the Texas Supreme Court laid out a non-exhaustive list of ten factors that courts should consider in assessing undue influence:

(1) the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence;

(2) the opportunities existing for the exertion of the type or deception possessed or employed;

(3) the circumstances surrounding the drafting and execution of the testament;

(4) the existence of a fraudulent motive;

(5) whether there had been a habitual subjection of the testator to the control of another;

(6) the state of the testator's mind at the time of the execution of the testament;

(7) the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted;

(8) words and acts of the testator;

(9) weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise;

15

(10) whether the testament executed is unnatural in its terms of disposition of property.

*Matter of Kam*, 484 S.W.3d at 651-53, *citing Rothermel*, 369 S.W.2d at 923. The first five factors on this list "address the first element of undue influence (i.e., whether such influence existed and was exerted with respect to the testament at issue); the next four factors concern the second element (i.e., whether the testator's will was subverted or overpowered by such influence); and the tenth factor is relevant to the third element (i.e., whether the testament would have been executed but for such influence)." *Kam*, 484 S.W.3d. at 652-653, *citing In re Estate of Clifton,* 2012 WL 3139864, at *3.

### 2. *The existence and exertion of an influence*

Appellants argue that the evidence fails to support a finding that they exerted any influence over Buford's decision to draft the Holographic Will, contending that, at most, the evidence suggested that Tait was merely present when Buford drafted the will. This argument, however, overlooks several key items of evidence.

First, the undisputed evidence demonstrated that when Buford first met Tait and Rueda, he did not have a will, and had not expressed any intent to draft a will; to the contrary, in his 2010 meeting with Dr. Clayton, Buford told her that his family did not write wills and that they had all died intestate. Tait himself admitted that when he initially suggested to Buford that he should draft a will, Buford was resistant to the idea, and that he spent several months trying to convince Buford of the need to do so. Tait's efforts were documented in two emails that he sent to attorney Pam Walker in October of 2014, in which he stated that he had been "working on" Buford for two years to get Buford to "trust" him enough to follow his advice, and that it took "several months"

16

before he "finally got [Buford] to write out a holographic will."[6] In addition, Tait submitted an invoice to Buford billing him for his assistance in preparing the Holographic Will, expressly stating that Tait spent four and a half hours at Buford's home on March 23, 2013, "to help him prepare will."[7]

Moreover, the record demonstrates that by the time Buford signed the Holographic Will, Tait had taken over virtually all of Buford's legal affairs, was corresponding directly with the attorneys and experts who had been retained to assist Buford in lifting the management trust, and Tait accompanied Buford to virtually every meeting he had with his attorneys to discuss his legal issues. We therefore conclude that there was both legally and factually sufficient evidence to support a finding that Appellants, and Tait in particular, had a clear opportunity to exert their influence on Buford's decision to sign the Holographic Will.

Appellants, however, contend that even if they had an opportunity to influence Buford's decision to sign the Holographic Will, there was no evidence to support a finding that they had an "improper or fraudulent motive" for doing so, as the will did not name either of them as beneficiaries. Appellants are correct that the Holographic Will did not make a direct bequest to either of them. However, there is evidence that Appellants could have indirectly benefitted by the Holographic Will, based on the will's creation of the "Buford Scott, Jr. Charitable Trust," into which all of Buford's assets were to be placed upon his death. In particular, the first draft of the trust document named Tait as trustee. The trust documents which were eventually signed as part of the August Will also named Tait as the trustee and gave him unfettered decision-making

---

[6] As well, Tait's own time-log indicates that he began discussing the need for a will with Buford as early as August 13, 2012, two months after he and Rueda first met with Buford.

[7] Tait also submitted a bill to Buford for assisting him with making changes or additions to the Holographic Will after he received feedback from Moseley about the will's deficiencies.

17

authority with respect to how to conduct the business of the trust. After Buford's death, Tait filed a certificate of formation of a non-profit corporation creating the "Buford Scott, Jr. Charitable Foundation," in which he listed himself, Rueda, and one other person as the sole members on the Board of Directors. From this, the jury could have inferred that Appellants influenced Buford to sign the Holographic Will that would in turn place them in control of the trust and its assets.

### 3. *Appellants' influence was effectively asserted*

Appellants next argue that the evidence was insufficient to support a finding that their influence was effectively asserted, or in other words, there was no evidence that Buford's will was overborne by them at the time he signed the Holographic Will. In particular, Appellants contend that there was no evidence to suggest that "Buford's mind was weak or that he was easily subjected to the influence of others at the time the Holographic Will was adopted."

In making this argument, Appellants first contend that the jury impliedly rejected the notion that Buford had any mental weakness because they found he had testamentary capacity to sign the Holographic Will. Yet testamentary capacity and undue influence are separate and distinct questions. *Rothermal*, 369 S.W.2d at 922 (noting that undue influence in the procurement of a will is a ground for contesting a will "separate and distinct from the ground of testamentary incapacity"). Accordingly, the jury's finding that Buford had testamentary capacity does not foreclose a finding that he was controlled by Appellants' actions.

Next, Appellants argue that the uncontroverted evidence demonstrated that they did not overpower Buford's decision-making process. In particular, Appellants contend that the evidence demonstrated that Buford was an unusually stubborn individual, who was not easily influenced or controlled, and that he generally did not trust others, especially when it came to his finances. Several witnesses, including three of Buford's long-time family friends and his former attorney,

18

Pam Walker, described Buford as being "quite stubborn" and "damn hard-headed."[8] True as that may be, there was also evidence that Buford was susceptible to the very type of influence that Tait and Rueda exerted over him. For example, Dr. Clayton, who examined Buford in 2010, believed that Buford exhibited signs of paranoia and was distrustful which, combined with his cognitive impairments, made him "extremely susceptible to the manipulation and control by others." In addition, at trial, Dr. Clayton opined that Buford did "not have the cognitive ability to access and determine the motives of others," and that in particular, he was "very susceptible to being taken advantage [of] by people that he thought were his friends and yet were only using him for his money." This had happened in the past when a person Buford believed was his friend manipulated him into giving away a significant amount of money. She further testified that Tait and Rueda had manipulated Buford by "feeding into [Buford's] paranoid delusions" about his cousins' role in the guardianship proceedings, in order to influence Buford's decision to disinherit them.

Appellants, however, contend that Dr. Clayton's opinion should not be considered because her examination was done some three years before execution of the Holographic Will. Dr. Clayton explained at trial, however, that the traits that she described in her report, (Buford's learning disabilities, his paranoia, and his susceptibility to undue influence) were of a "permanent" nature and were not likely to change or improve. In fact, she opined that, if anything, these traits were likely to get worse over time.

Moreover, attorney Pam Walker, who represented Buford shortly after he signed the Holographic Will, testified that she believed Buford had "paranoid" tendencies, and found him to be "susceptible" to being influenced by someone he trusted. She further believed--after learning

---

[8] Each of the three friends or their spouses were named as beneficiaries in Buford's August Will, and therefore had a vested interest in convincing the court that Buford was not unduly influenced by Appellants.

19

that Buford had left the bulk of his estate to Appellants in his August Will--that Appellants had taken advantage of Buford's paranoid tendencies, and had fueled his suspicions about the cousins' role in the earlier guardianship proceedings to serve their own purposes.[9]   In particular, Walker recalled that on at least two occasions Tait "bad-mouthed" Buford's cousins in front of Buford.

Tait himself admitted that Buford exhibited irrational and paranoid tendencies, had a general distrust of the judicial system, and often did not understand what was necessary to protect his assets.   More importantly, Tait admitted at trial that despite Buford's paranoid tendencies and his stubborn nature, he was able to "influence" Buford to do what he thought was in his best interest to "protect" Buford's finances and in particular to draft the Holographic Will.

The record also contains evidence from which the jury could have inferred that Tait did more than simply convince Buford to draft the Holographic Will.   In particular, attorney Pam Walker and Buford's cousins testified that based on their experience with Buford, they did not believe he was capable of writing the Holographic Will on his own, and that they believed it may have been dictated to him, or that Buford had copied it from another writing.   And Tait all but admitted that he was in control of dictating the terms of the Holographic Will to Buford, as he responded to attorney Scott Moseley's critique of the Holographic Will in an email as follows: "If I'd known [the Holographic Will] should include most the [sic] same language of a more formal Texas will as you now indicate, *I'd have had him write it differently*," and that he intended to have Buford "add additional provisions to his Will as you suggest."   (emphasis added).

---

[9] In addition, Walker testified at trial that she felt "duped" by Appellants and believed that they had misled her and the experts they retained in the action to lift the guardianship into believing that Buford was living more independently than he actually was.   In particular, she believed that Appellants had not disclosed to her, or to the expert witnesses that they were providing significant assistance to Buford, making it seem as if he was managing his life on his own, and ensuring that he presented in a well-groomed fashion when he met with them.

20

Accordingly, we conclude that the record contains both factually and legally sufficient evidence to support a finding that Buford was susceptible to Appellants' influence and that Appellants effectively asserted their influence by not only convincing Buford to draft the Holographic Will but by controlling and directing his actions in doing so.

4. *Buford would not have executed the Holographic Will but for Appellants' influence*

Appellants next contend that the evidence was insufficient to support a finding that Buford would not disinherit his cousins and leave his entire estate to charity, but for Appellants' influence. According to Appellants, there was nothing "unnatural" about Buford's decision to do so, and that to the contrary, the decision was reasonably explained by the fact that Buford was upset with his cousins for their alleged role in the prior guardianship proceedings and by the fact that he did not have any significant relationship with them. Appellants further contend that Buford told both attorneys Moseley and Walker of his intent to disinherit his cousins and of his intent to leave his estate to charity, thereby demonstrating that the Holographic Will expressed his "true wishes." And according to Appellants, there is nothing in the record to rebut these assertions. We disagree.

First, there is nothing in the record to indicate that Buford made any statements to either Moseley or Walker expressing his intent to disinherit his cousins or his intent to leave his money to charity. Although Moseley recalled that Buford informed him that he was angry with his cousins for their alleged involvement in the guardianship proceedings, he did not recall if Buford ever expressed any intent to disinherit them. Similarly, Walker testified that when she spoke with Buford about the possibility of drafting a formal will in November of 2014, Buford did not tell her how he wanted to dispose of his estate, and instead indicated that he had not yet decided what to do with his money and that he needed time to think about it. He made this statement despite the fact that he had signed the Holographic Will over a year and half prior to that meeting. Further,

21

Walker recalled that although she suggested to Buford that he had the option of leaving his money to charity, Buford never indicated that he intended to do so.

We nevertheless recognize that Buford's decision to disinherit his cousins and to give his money to charity, without more, is not necessarily indicative of an unnatural disposition and does not prove that the decision was the product of undue influence. *See generally Estate of Davis v. Cook*, 9 S.W.3d 288, 294 (Tex.App.--San Antonio 1999, no pet.) (recognizing that testator's decision to exclude nieces and nephews in favor of charities, without more, did not establish an unnatural disposition or the existence of undue influence). However, there are several factors that the jury could have considered in finding that Buford's disposition was in fact unnatural and was the result of Appellants' undue influence. Before meeting Appellants, Buford had expressed an intent to die intestate, which meant that his cousins would have inherited his entire estate. The jury could have concluded that Appellants spent months fueling Buford's animosity towards his cousins and convinced him to sign the Holographic Will disinheriting them. In addition, there is nothing in the record to suggest that Buford had previously given any consideration to leaving his estate to charity before he met Appellants, or that he had even donated to a charity in the past.

Thus, the jury was presented with two alternative explanations for why Buford signed the Holographic Will--either Buford had formulated a true intent to disinherit his cousins and leave his estate to charity, or his decision to do so was influenced by Appellants' long-term plan to take control of his estate. When, as here, a jury is presented with two reasonable explanations for why a testator might draft a will that appears unnatural, the jury is free to choose between those explanations. *See, e.g.*, *In re Estate of Johnson*, 340 S.W.3d 769, 783-784 (Tex.App.--San Antonio 2011, pet. denied) (when a jury is faced with alternative explanations for why a testator might otherwise draft a will that appears unnatural, the jury is free to determine which of

the explanations it finds more credible); *see also In re Estate of Luthen*, No. 13-12-00576-CV, 2014 WL 6632952, at *7-8 (Tex.App.--Corpus Christi Nov. 24, 2014, no pet.) (mem. op., not designated for publication) (recognizing that when "competing explanations are advanced" by the parties with regard to a testator's reason for disinheriting a family member, "the jury must determine which explanation should be given more weight and which explanation is more credible.").

In this case, there was both factually and legally sufficient evidence for the jury to choose Appellees' theory that Buford was in fact influenced by Appellants' plan to take control of his estate, and that Buford would not have drafted the Holographic Will disinheriting his cousins but for Appellants' undue influence.[10]

Appellants' Issues One through Three are Overruled.

## B. Validity of the July and August Wills

The trial court invalidated the July 21, 2015 and the August 13, 2015 wills based on jury findings that for both, Buford lacked testamentary capacity and that he signed them as the result of undue influence. In Issues Four through Eleven, Appellants contend that the evidence was both factually and legally insufficient to support these jury findings. Because Appellants' arguments are virtually identical with respect to both Wills, we address them together. We begin with the issue of undue influence.

### 1. Appellants had the opportunity to exert influence over Buford

Although Appellants contend that there was no evidence to support a finding that they pressured Buford into signing the July and August Wills, they do not contest that they had the opportunity to do so, or a motive for exerting their influence over him. Notably, the opportunity

---

[10] And because of this finding, we conclude that it is unnecessary to decide whether the evidence is sufficient to support the finding that Buford subsequently revoked the Holographic Will.

to influence Buford increased after the management trust was lifted in November of 2014. And within days after the management trust was lifted, Buford signed a Limited Power of Attorney giving Tait control over virtually all of Buford's financial, legal, and medical decisions. In addition, despite the fact that both Walker and Moseley offered to assist Buford with drafting a formal will to replace the Holographic Will, Tait declined their offers, and instead spent the next few months assisting Buford with making changes or additions to his Holographic Will. He later took it upon himself to draft the various formal wills that Buford signed in July and August of 2015 during his final illness. In effect, the jury could have inferred that Appellants were engaging in a course of conduct to ensure that they retained complete control over his decision-making process with respect to the future wills that he drafted.

As well, Appellants' motive for influencing Buford to sign the July and August Wills was obvious, as they received bequests exceeding two million dollars in both the July and August Wills. Accordingly, we conclude that there was both factually and legally sufficient evidence to support a finding that Appellants had a clear opportunity and motive to exert their influence over Buford in the drafting of these two wills.

### 2. *Appellants effectively asserted their influence over Buford*

Appellants next contend the evidence was insufficient to prove that they effectively asserted influence over Buford or that he was susceptible to influence at the time that he signed the two wills. In particular, they contend that Dr. Clayton was the only witness to discuss Buford's susceptibility to influence at the time he signed the wills, but that her testimony should be disregarded.

First, Appellants once again point out that Dr. Clayton only evaluated Buford one time in 2010, and they argue that she therefore had no basis for opining on his mental status five years

24

later when the wills were signed. But as we explain above, Dr. Clayton testified that Buford's vulnerability and susceptibility to undue influence was of a permanent nature and if anything, was likely to get worse over time. Moreover, Dr. Clayton testified that Buford's susceptibility increased due to his physical ailments and the medication that he was taking during his final illness in the hospital. By the time of his hospital stay, Buford had tumors in both his liver and lungs. He was in liver and kidney failure, had low oxygen levels, and had toxins in his blood. A treating physician noted that Buford did not appear to understand his diagnosis, was anxious and in pain, and exhibited "scattered thinking" during his hospital stay. Dr. Clayton further pointed out that while in the hospital, Buford was being treated with narcotic pain medicines that would have affected his cognitive abilities. Dr. Clayton concluded that Buford's physical condition and his medications would have likely increased his preexisting paranoid tendencies, making it even easier to manipulate or take advantage of him.

A testator's physical ailments may inform the jury of the testator's mental status, if the evidence sufficiently links the two at the time of a will signing. *See, e.g.*, *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983) (upholding trial court's finding that testator lacked testamentary capacity where evidence of occlusion of the carotid arteries was consistent with mental incapacity at the time of will signing); *see also Kinsel v. Lindsey*, 526 S.W.3d 411, 420 (Tex. 2017) (recognizing that "evidence of physical problems that are consistent with or can contribute to mental incapacity is probative" on the issue of an individual's mental capacity). But Appellants argue that Dr. Clayton's testimony did not sufficiently link Buford's physical condition to his mental status on the exact days that he signed the two wills. In support of this argument, Appellants rely on our sister court's holding in *Horton v. Horton*, 965 S.W.2d 78, 86 (Tex.App.-- Fort Worth 1998, no pet.). But *Horton* is inapposite. In *Horton*, a testator, who was dying of

25

cancer, was taking pain medication and suffering from periodic hallucinations during the general time period in which he had signed a will. *Id.* at 86. There was no evidence, however, that the testator was on medication or that he was suffering from any hallucinations on the particular day that he signed his will. *Id.* The court therefore concluded that there was insufficient evidence to support a finding that he lacked *testamentary capacity* at the time of the will signing. *Id.*

However, the court used a different analysis when discussing the issue of whether there was sufficient evidence to support a finding that the testator had been *unduly influenced* into signing the will. The court noted that in making a determination of undue influence, the jury could consider more general evidence that the testator had cancer and was in considerable pain in the days leading up to the will signing, as that evidence was relevant to his "physical incapacity to resist or the susceptibility of his mind to an influence exerted."[11] *Id.* at 88. We agree with this analysis, and we conclude that the jury was entitled to rely on Dr. Clayton's testimony concerning Buford's weakened physical condition during the general time period in which he signed the July and August Wills, as evidence of his enhanced susceptibility to Appellants' influence over him.

Beyond that, the jury could have observed Buford's weakened condition from the videotaped recordings of the will signings. Dr. Clayton had in fact observed that Buford appeared confused and "kind of dazed" in the videotape recordings. Dr. Clayton also testified that Tait was essentially leading Buford through his responses on the recordings to make it appear that he was more lucid than he actually was.

We recognize that Appellants presented conflicting evidence regarding Buford's mental state on the day of the will signings. For example, Appellants presented the testimony of the

---

[11] In *Horton*, however, the court found that, despite the testator's weakened physical state, there was no evidence to support a finding of undue influence, as there was no evidence that the will proponent had an opportunity or did exert influence over him. 965 S.W.2d at 88. Unlike the situation in *Horton*, we have already concluded that Appellants did have the opportunity to influence Buford's decision to sign the wills, as well as a clear motive for doing so.

notary public and two of the witnesses who were present at the will signings, all of whom testified that they believed Buford appeared, (1) to understand what he was doing, (2) determined to sign the wills, and (3) not to have been coerced into signing the wills.[12]  None of those witnesses, however, had any knowledge of Buford's pre-existing vulnerabilities, or the history of his relationship with Appellants.

We also find sufficient evidence that Appellants took advantage of Buford's weakened mental state while he was in his final illness to maintain control over his decision-making process. First, although Buford had already signed a Limited Power of Attorney in November of 2014 giving Tait control of Buford's legal, business, and medical affairs, the day after his hospital admission, Buford signed a medical power of attorney naming Tait as his agent for making medical decisions, and Rueda as his first alternate agent.  Shortly thereafter, Buford signed a Texas Statutory Durable Power of Attorney, designating Tait as his agent for virtually all of his legal, financial, business, and personal matters.

In addition, Tait took it upon himself to draft at least three different formal wills for Buford to sign once Appellants realized that he was dying and arranged for the will signing to take place during Buford's hospital stay.   Tait also mispresented the terms of the wills to Buford during the will signings by falsely claiming that Buford was leaving the "majority" of his estate to a charitable trust, when in fact only one minor asset was placed in the trust and the valuable assets were devised

---

[12] Appellants also presented the testimony of an emergency room doctor, Dr. Kathleen Delaney, who saw Buford in the hospital on August 15, 2015, the day that he signed the August Will.  She believed that Buford appeared "completely oriented" and "very alert" that day.  Dr. Delaney, however, did not conduct a mental status examination of Buford, and there was no evidence that she was aware of any of Buford's pre-existing mental limitations, his paranoid tendencies, or his susceptibility to the influence of others.  As well, she admitted that she was not aware of all of the medications that Buford was taking at that time.

to Appellants.[13]  The jury could have inferred that this misrepresentation was the final step in a purposeful scheme to ensure that Appellant left the bulk of his estate to them.

Accordingly, we find that the record contains both factually and legally sufficient evidence to support a finding that Appellants effectively exercised their influence over Buford and effectively manipulated him into signing the July and August Wills.

### 3. Buford would not have executed the July and August Wills but for Appellants' influence

Appellants also contend that the record does not support a finding that Buford would not have signed the July and August Wills but for Appellants' influence, contending that there was nothing unnatural about the dispositions that Buford made in those wills.   In particular, Appellants once again contend that Buford had consistently expressed his intent to disinherit his cousins prior to signing the July and August Wills, and that he had further expressed to various individuals how grateful he was to Appellants for assisting him with his legal issues and that he had developed a great affection for them.   Appellants further argue that there is no evidence in the record that Buford had ever expressed an intent to dispose of his property in any other manner.   For the same reasons, and evidence noted in Section III(A)(4) of this opinion, we likewise conclude the evidence supports the jury's finding.   And for the July and August Wills, there was evidence to suggest that Appellants had misled Buford into believing that the bulk of his estate was going to his charitable trust, when in fact the express terms of the July and August Wills gave the bulk of his estate to Appellants.   The jury therefore could have inferred that Buford was not aware of the actual terms of the wills and that they did not express his true intent.   Accordingly, we conclude that there was

---

[13] Appellants contend that Tait did not mislead Buford on this point.  In particular, Tait testified   that the mineral interests given to the Charitable Trust would be worth 10 to 20 million dollars over the course of 20 years.   Appellants also claimed that the land they received was only worth approximately 1.6 million dollars.   Tait, however, did not support those opinions with any facts and the jury therefore could have discounted the claim.

both factually and legally sufficient evidence to support the jury's finding that Buford signed the July and August Wills as the result of Appellants' undue influence.[14] Appellant's Issues Four through Eleven are Overruled.

### C. The Request for Attorney's Fees

At trial, Appellants requested $416,978.75 in attorney's fees, and $29,509.09 in expenses with regard to submitting the August Will to probate, and for defending against Appellees' will contest. Section 352.052 of the Texas Estates Code allows for the payment of a designated executor's or beneficiary's legal expenses when that person defends or prosecutes a will in good faith and with just cause, whether or not that person was successful in doing so. *See* TEX.EST.CODE ANN. § 352.052. The jury, however, found that Appellants did not act in good faith or with just cause in doing so, and the trial court therefore denied Appellants' request for fees and expenses. In Issues 12 through 17, Appellants contend that the evidence was both legally and factually insufficient to support the jury's determination that they did not act in good faith, and that the trial court therefore erred in denying their request for attorney's fees. Although Appellants raise separate issues with respect to whether they acted in good faith and just cause with regard to defending each of the three wills, we address these arguments in a more global fashion.

#### 1. The law on attorney's fees

Whether an executor acts in good faith and with just cause in prosecuting or defending a will is a question of fact, to be determined by the jury upon a consideration of all of the circumstances of a case. *Huff v. Huff*, 124 S.W.2d 327, 330 (1939); *see also Russell v. Moeling*, 526 S.W.2d 533, 536 (Tex. 1975) (recognizing that the question of whether executor acted in good

---

[14] Having reached this conclusion, we need not address Appellants' alternate argument that the evidence did not support a finding that Buford lacked testamentary capacity to sign those two wills.

29

faith and with just cause is a question for jury that should be determined in the original probate proceeding); *Matter of Kam*, 484 S.W.3d at 654 (recognizing that good faith is ordinarily a question of fact and that an appellate court should uphold a jury finding unless the evidence conclusively established the party's good faith).

To be sure, a finding that an individual procured a will by undue influence does not preclude a finding that the individual acted in good faith and with just cause in attempting to admit the will to probate or in defending the will against a will contest. *Harkins v. Crews*, 907 S.W.2d 51, 62 (Tex.App.--San Antonio 1995, writ denied), *citing Huff*, 124 S.W.2d at 330.

### 2. *Application*

Appellants contend that there was no evidence that they acted in bad faith or with a fraudulent intent in offering the various wills to probate. Rather, the "uncontroverted evidence" demonstrated that they submitted the wills to probate in good faith because they genuinely believed that the wills expressed Buford's "true intent." This argument, however, is essentially a rehash of the arguments set forth above, with Appellants contending that they had reason to believe that Buford wished to disinherit his cousins, that Buford wished to leave part of his estate to charity, and that Buford also wanted to benefit Appellants due to his gratitude for assisting him with his legal and other issues over the years.

Although the jury was free to believe Appellants' theory that they acted in good faith in defending the wills, the jury was also presented with an alternative theory that Appellants did so in bad faith by perpetrating a long-term scheme to gain access to Buford's not insignificant estate. The record contains sufficient evidence to support the jury's finding that implicitly accepts the existence of such a scheme. That scheme negates any good faith or just cause in submitting any

30

of the wills to probate or in defending against Appellees' will contest.   We conclude that the jury's findings were supported by both factually and legally sufficient evidence.

Appellants' Issues Twelve through Seventeen are Overruled.

## V. CONCLUSION

We affirm the trial court's judgment.


JEFF ALLEY, Chief Justice

April 7, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.